*Cunningham, et al. v. Baltimore County, et al.*, No. 3461, September Term, 2018, Opinion by Graeff, J.

**COLLATERAL ESTOPPEL – FINAL JUDGMENT – SUPPRESSION RULING**

Collateral estoppel bars the re-litigation of an issue decided in a prior adjudication if, in addition to other requirements, "there was a final judgment on the merits in the prior adjudication[,]" and "the party against whom the doctrine is asserted had a fair opportunity to be heard on the issue in the prior adjudication." *Clark v. Prince George's County*, 211 Md. App. 548, 581, *cert. denied*, 434 Md. 312 (2013).

In a prior criminal case against appellant, the circuit court denied his motion to suppress evidence on the basis that the entry into the home to serve an arrest warrant was lawful. Appellant was later acquitted of the criminal charges. In the subsequent civil litigation regarding the same entry, the court found that appellants were collaterally estopped from relitigating the constitutionality of the entry because the issue had been litigated and decided by the criminal court. Under these circumstances, however, when a defendant is acquitted of criminal charges and there is no ability to seek appellate review of a pretrial suppression ruling, there is no final judgment for collateral estoppel purposes. Accordingly, because appellant had no opportunity to appeal the denial of his motion to suppress in his criminal case, he was not collaterally estopped from challenging the entry in the civil case.

Additionally, the other appellants who were not parties to the criminal case did not have a full opportunity to be heard on the issue, and therefore, collateral estoppel did not preclude them from litigating the constitutionality of the initial entry either.

**42 U.S.C. § 1983 – MARYLAND DECLARATION OF RIGHTS ARTICLE 26 – SEARCH AND SEIZURE – ENTRY INTO HOME TO SERVE ARREST WARRANT – REASONABLE BELIEF**

Law enforcement may enter a private home to serve an arrest warrant only when (1) an officer has reason to believe that "the location is the defendant's residence"; and (2) the police have a reasonable belief that the subject of the warrant is inside the residence. *United States v. Hill*, 649 F.3d 258, 262 (4th Cir. 2011). In this context, the "reason to believe" standard does not rise to the level of probable cause, but instead is akin to reasonable suspicion.

Here, the officers had previously confirmed that the warrant subject was the lessee at that address on the warrant and that she had two small children. Police knocked on the door and heard noises indicating that someone was coming up to the door and moving things, a brief baby cry, and the sound of someone coughing inside. In the absence of information to the contrary, it was reasonable for the officers to believe that the warrant

subject was inside the residence at the time under these circumstances. Accordingly, the entry was lawful.

**42 U.S.C. § 1983 – MARYLAND DECLARATION OF RIGHTS ARTICLES 24 AND 26 – EXCESSIVE FORCE – QUALIFIED IMMUNITY – DISPUTES OF FACT**

In determining whether a police officer has used excessive force in violation of 42 U.S.C. § 1983 or Articles 24 and 26 of the Maryland Declaration of Rights, we look to "whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Estate of Blair by Blair v. Austin*, No. 35, Sept. Term, 2019, 2020 WL 2847516, at *8 (Md. June 2, 2020) (plurality opinion). When the issue of reasonableness of a police officer's action or the applicability of qualified immunity "turns upon which version of facts one accepts, the jury, not the judge, must determine liability." *King v. State of California*, 242 Cal. App. 4th 265, 289 (2015).

In this case, where there was a dispute of fact regarding what happened in the moments leading up to when the officer fired the fatal shot, it was for the jury to determine, based on the evidence, what occurred, and whether, in light of its finding, the officer acted reasonably. Because the jury decided that the officer's actions were not reasonable in this case, the circuit court erred in usurping the jury's finding and granting appellees' judgment notwithstanding the verdict.

**APPEALBILITY – FINAL JUDGMENT – CONDITIONAL GRANT OF MOTION FOR NEW TRIAL**

On appellees' post-trial motion for judgment notwithstanding the verdict, for a new trial and for remittitur of judgment, the circuit court granted judgment to appellees notwithstanding the verdict, and, should that decision not withstand appellate scrutiny, it conditionally granted a new trial because it found the verdict was inconsistent.

Under normal circumstances, "an order granting a new trial is not immediately appealable because it is an interlocutory order" that is not "ultimately reviewable" until "appeal is taken from the final judgment." *Buck v. Cam's Broadloom Rugs, Inc*., 328 Md. 51, 57 (1992). In contrast, when the order for a new trial is conditioned on the reversal of the grant of judgment notwithstanding the verdict, the judgment is appealable.

**JURY VERDICTS – IRRECONCILABLY INCONSISENT VERDICT – MOTION FOR NEW TRIAL**

The circuit court conditionally granted appellees' motion for a new of trial on the basis that the verdict sheet was irreconcilably inconsistent because the jury did not apportion the damage award between the state law claims, which were subject to a damages

cap pursuant to the Local Government Tort Claims Act ("LGTCA"), and the federal § 1983 claims, which were not subject to any damages cap. As a result, the court concluded that appellees were entitled to a new trial.

A jury verdict is irreconcilably inconsistent "[w]here the answer to one of the questions in a special verdict form would require a verdict in favor of the plaintiff and an answer to another would require a verdict in favor of the defendant[.]" *S. Mgmt. Corp. v. Taha*, 378 Md. 461, 488 (2003) (quoting *S&R Inc. v. Nails*, 85 Md. App. 570, 590 (1991)). Under these circumstances, the verdict sheet was not irreconcilably inconsistent, and circuit court abused its discretion in granting a conditional new trial on this basis.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 3461

September Term, 2018

_____

COREY CUNNINGHAM, et al.

v.

BALTIMORE COUNTY, MARYLAND, et al.

_____

Meredith,
Graeff,
Eyler, James R.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Graeff, J.
_____

Filed: July 1, 2020

Chief Judge Matthew J. Fader did not participate in the Court's decision to designate this opinion for publication pursuant Md. Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

On August 1, 2016, two Baltimore County police officers attempted to serve arrest warrants on Korryn Gaines and Kareem Courtney at Ms. Gaines' apartment. The warrant for Ms. Gaines was for failure to appear for a misdemeanor trial, and the warrant for Mr. Courtney was for second-degree assault. The officers testified that they repeatedly knocked on the door, and although they heard movement inside, no one opened the door. They ultimately kicked the door open, and when they entered the apartment, they saw Ms. Gaines siting on the floor with a pistol grip shotgun.

The officers retreated and called for back-up. This led to a six-hour stand-off between Ms. Gaines, positioned in the apartment with her five-year-old son Kodi, and multiple law enforcement officers stationed outside the apartment. Kareem Courtney, Ms. Gaines' fiancé and Karsyn Courtney, the daughter of Mr. Courtney and Ms. Gaines, left when the police arrived.

Corporal Royce Ruby testified that, after hours of requests for Ms. Gaines to put down the gun, she moved to the kitchen, raised her shotgun to firing position, and pointed it toward the officers positioned by the doorway. At that point, Corporal Ruby fired a shot that killed Ms. Gaines, and a bullet exited her body and injured Kodi.

A lawsuit in the Circuit Court for Baltimore County ensued. Rhanda Dormeus (mother of Ms. Gaines), individually and as personal representative of Ms. Gaines' estate, Mr. Courtney, individually and on behalf of minor child Karsyn Courtney, Corey Cunningham (father of Kodi Gaines), on behalf of minor child Kodi Gaines, and Ryan Gaines (father of Ms. Gaines), appellants, sued Baltimore County, Corporal Ruby, and other law enforcement officers on numerous grounds related to Ms. Gaines' death. On

January 29, 2018, the court granted a motion for summary judgment and dismissed the claims against all defendants except Baltimore County and Corporal Ruby, appellees.

On February 16, 2018, after a three-week trial, a jury returned a verdict in favor of appellants, awarding more than $38 million in combined economic and non-economic damages. Appellees filed a Motion for Judgment Notwithstanding the Verdict, for a New Trial and for Remittitur of Judgment. On February 14, 2019, the circuit court issued an Order and a 75-page Memorandum Opinion that, among other things, granted appellees' motion for judgment notwithstanding the verdict. In the alternative, the court granted the defendants' motion for a new trial on the ground that the verdict was defective because it "did not specify the apportionment, if any, of the total jury award between the [s]tate and [f]ederal [c]laims." The court further found that the non-economic damages awarded were "excessive and shocked the conscience," and "but for" the other rulings, it "would remit the [jury's] award."

On appeal, appellants present multiple questions for this Court's review,[1] which we have consolidated and rephrased as follows:

1. Did the circuit court err in granting the motion for summary judgment on the ground that the initial entry into the apartment by the police officers was constitutional?

---

[1] Appellants filed three separate opening briefs, as follows: (1) Ryan Gaines (father of victim Korryn Gaines); (2) Corey Cunningham, on behalf of Kodi Gaines; and (3) the Estate of Korryn Gaines, Rhanda Dormeus (mother of Korryn Gaines), and Kareem Courtney (fiancé of Korryn Gaines) in his personal capacity and as next of kin of Karsyn Courtney. All three briefs adopt and incorporate the facts, arguments, and requests for relief asserted by the other two. The briefs present a total of eight separate questions presented, which we have consolidated as set forth above.

2. Did the circuit court err in finding that appellees' post-trial motions were timely filed?

3. Did the circuit court err in granting appellees' Motion for Judgment Notwithstanding the Verdict ("JNOV") and vacating the damage awards for appellants on the basis that Corporal Ruby was entitled to qualified immunity?

4. Did the circuit court err in finding that the jury verdict was irreconcilably inconsistent, requiring a new trial if the grant of JNOV was reversed?

5. Did the circuit court err in finding, in the alternative, that remittitur was an appropriate remedy?

For the reasons set forth below, we conclude that the court properly granted the motion for summary judgment regarding the initial entry, but it improperly granted the motion for JNOV and, in the alternative, the motion for new trial based on an inconsistent verdict. Accordingly, we shall affirm, in part, and reverse/vacate, in part, the judgments of the circuit court and remand for further proceedings.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.**

**August 1, 2016**

**A.**

**Initial Entry**

The evidence elicited at trial established that, on August 1, 2016, at approximately 9:00 a.m., Officer John Dowell and Officer Allen Griffin, members of the Baltimore County Police Department, traveled to the Carriage Hill Apartments, 4 Sulky Court, Apartment T-4 to execute arrest warrants for Korryn Gaines and Kareem Courtney. The officers had a bench warrant for Ms. Gaines, age 23, for failing to appear for a misdemeanor

3

trial, and an arrest warrant for Mr. Courtney, her fiancé, age 40, for a second-degree assault resulting from an alleged domestic incident involving Ms. Gaines.

Ms. Gaines' apartment was the address listed on both arrest warrants, although Mr. Courtney did not permanently reside there. Officer Griffin testified that, as part of the normal background check procedure, he had visited the rental office the prior week and discovered that Ms. Gaines was the sole lease holder of the apartment. He also conducted an MVA records check on Mr. Courtney, which showed that Mr. Courtney resided at a different address.

When the officers went to serve the arrest warrants, they were not dressed in uniform, but they had badges on lanyards around their necks that were plainly visible.[2] They arrived at the address listed on the warrants and located apartment T-4 on the lower-level of the building. Officer Griffin positioned himself on the knob side of the door, and Officer Dowell positioned himself on the hinge side.[3] They briefly listened to determine if they could hear anyone inside.

Officer Griffin testified that he knocked on the door. At first, the officers did not identify themselves as police officers. They heard a cough inside the apartment, but no one answered the door. Officer Griffin remained on the knob side of the door while Officer

---

[2] Officer Griffin testified that he was wearing a blue button-down shirt with "blue jeans, boots, my gun, and a ballistic vest on underneath."

[3] When positioned in the hallway, the "knob side" of the door was the right side of the door and the hinge side was the left. The door opened inwards.

Dowell exited the building and went out front to the patio to ensure that no one left the apartment through the sliding glass door.

Officer Griffin continued to knock on the door at a volume that Officer Dowell could hear from his position outside. Officer Griffin heard movement inside that sounded like someone coming up to the door, looking out the peep hole, and then walking away. He also heard other movement, such as "things being picked up and moved around." After hearing this movement, he identified himself as Baltimore County Police and directed the occupants to open the door. He did not state the police purpose.

Officer Griffin then instructed Officer Dowell to get the key to the apartment from the rental office. Officer Dowell did not want to leave the patio door unattended, so he radioed for a nearby patrolman, Officer Kemmerer, to retrieve the key. While Officer Griffin was waiting for the key, he continued to knock and could hear a child crying inside. Officer Kemmerer then arrived and gave the key to Officer Dowell, who returned to the apartment door to give the key to Officer Griffin.

Officer Griffin unlocked and opened the door, but it only opened approximately four inches because a security chain was fastened on the inside of the door. Through the gap, Officer Griffin could see inside the apartment, and he saw a female sitting on the dining room floor. He testified that he recognized her as the subject of the warrant based on a photo they had of Ms. Gaines. He again identified himself as Baltimore County Police and asked her to open the door. She did not move or respond to his directions.

Officer Griffin then attempted to "put his shoulder into the door" to try to break the chain, but it did not move. Officer Dowell asked Officer Griffin to stand aside so he could

5

kick the door open. Officer Dowell kicked the metal door and the chain sprung open. Officer Griffin entered the apartment with his handgun drawn but held "low ready," and Officers Dowell and Kemmerer remained in the hallway. Officer Griffin observed Ms. Gaines seated on the floor pointing a shotgun towards him "[l]ike she was gonna shoot." She told him to "[g]et out."

Officer Griffin, realizing that he had no good cover in the apartment, retreated back to the hallway yelling "[g]un, gun, gun" and "[t]ake cover" to the other officers. Officers Griffin and Dowell positioned themselves on the knob side of the door and Officer Kemmerer moved to the hinge side of the door. They radioed for back-up from additional law enforcement and "held the door" to make sure Ms. Gaines did not attempt to leave while they waited for reinforcements to arrive. While Officer Griffin was calling for help, Officer Dowell asked Ms. Gaines to put the gun down. She asked to speak to a supervisor. Officer Dowell testified that Ms. Gaines told him that she "just wanted [them] to leave," and the warrant was fraudulent. Additional law enforcement arrived shortly thereafter and relieved the officers.

Mr. Courtney testified that he was lying in bed that morning with Ms. Gaines, their daughter Karsyn (age 2), and Ms. Gaines' son Kodi from a previous relationship. Ms. Gaines got out of bed and went to the bathroom.

A few minutes after Ms. Gaines left the bedroom, Mr. Courtney heard the apartment door being kicked in. He testified that he did not hear any knocking, and the officers did not announce themselves as police prior to entering. In reaction to the "boom" of the door being kicked opened, he jumped out of bed, and went into the hallway. He saw the officers

6

in the doorway, and Ms. Gaines standing by the bathroom. He grabbed his clothing, told the children to remain in the bedroom, and went down the hallway to find out what was going on. When the officers saw him, they told him to put his hands up. He testified that there were two or three officers in the apartment, two in plain clothes and one in uniform, and they had their guns drawn and pointed at him. Mr. Courtney knew they were police officers and told them not to shoot because there were children in the apartment.

The officers directed him and the children, who had followed Mr. Courtney down the hallway, out the apartment door, but Kodi broke away and ran back toward his mother, who was still standing outside the bathroom. When Mr. Courtney turned back to try to grab Kodi, he saw that Ms. Gaines was holding a pistol grip shotgun at her side.[4]

Mr. Courtney tried to convince Ms. Gaines to let Kodi go with him, but Ms. Gaines did not respond to his request. When Mr. Courtney tried to tell Ms. Gaines that it was the police and "nothing was going to happen to [her]," she told him "they're going to kill your dumb ass." He stated that her behavior was abnormal. Unable to convince Ms. Gaines to leave with Kodi, Mr. Courtney voluntarily exited the apartment with Karsyn as directed by police. Mr. Courtney was handcuffed, placed in a squad car, and later transported to the police station.[5]

---

[4] Mr. Courtney testified that Ms. Gaines had lawfully purchased the shotgun for safety reasons after a break-in occurred at a previous apartment. He stated, however, that he did not have prior knowledge that it was in the house.

[5] Mr. Courtney testified that he was released on his own recognizance at approximately 12:30 a.m. the following morning. The second-degree assault charge was nolle prossed, but he subsequently was indicted on charges relating to CDS found in the

## The Stand-Off

Officer Flaherty, a member of the Baltimore County Police Community Action Team ("CAT"), was the first to arrive on the scene in response to Officer Griffin's call for assistance. At approximately 9:25 a.m., clad in body armor and armed with his rifle, he went to the apartment door and took up position on the knob side of the door, using the brick wall outside of the apartment as cover.[6] Officer Kemmerer also was in the hallway with him. Officer Flaherty was instructed by his sergeant not to shoot unless Ms. Gaines charged.

From that position, Officer Flaherty could see Ms. Gaines seated cross-legged with the shotgun pointed towards the door, but not raised. He remained in that position to watch Ms. Gaines for approximately 45 minutes while waiting for the tactical team to arrive. The officers tried to talk with Ms. Gaines during this period of time, but she refused to leave.

The Tactical Team ("TacTeam") arrived at 9:41 a.m. More than 30 armed officers and "counter snipers" took up positions in and around the apartment building. Ms. Gaines' mother, Rhanda Dormeus, who arrived on the scene between 9:30 and 10:00 a.m., informed

---

apartment. (*State v. Kareem Courtney*, Case No. 03K16004299). As discussed in more detail, *infra*, Mr. Courtney filed a motion to suppress in the CDS case, challenging the initial entry by Officers Dowell and Griffin. The court denied the motion, and he was acquitted of the drug charges.

[6] The hallway area had brick walls that Corporal Ruby testified could not be penetrated by a shotgun round.

law enforcement that Ms. Gaines had a history of mental illness. The TacTeam was aware that Kodi was still with Ms. Gaines in the apartment. By 10:30 a.m., at least four armed TacTeam members were positioned in the small hallway area outside of Ms. Gaines' doorway.[7] The TacTeam parked a large command truck outside the building and set up a command post in a nearby church.[8]

The TacTeam also occupied the neighboring apartment unit, T-3, which shared a wall with the dining room in T-4. The occupants of apartment T-3 remained in the apartment throughout the encounter despite the officers advising them to leave. The team used this apartment as a "staging area" to sit down or use the bathroom while still remaining in close proximity to Ms. Gaines' apartment. There were concerns, however, about shots being fired through the joint wall. The TacTeam members attempted to drill holes in the shared wall to insert a fiberoptic scope to see into Ms. Gaines' apartment or to create an entry port for explosives to breach the wall if necessary, but the wall was too thick.

The Hostage Negotiation Team ("HNT"), which arrived shortly after the TacTeam, was able to establish a "good rapport" with Ms. Gaines, and she and HNT team leader

---

[7] The hallway outside Ms. Gaines' door was a small L-shaped landing area (estimated 32 square feet) with entrances to apartments T-2, T-3, and T-4. The doors to T-3 and T-4 are along the same wall on the right as you enter the area by going down a short set of stairs, while the entrance to T-2 is on a perpendicular wall, i.e., straight ahead as you enter the space. The walls in the hallway area are predominantly made of brick.

[8] Members of Ms. Gaines' family, including her parents, Rhanda Dormeus and Ryan Gaines, arrived on the scene, but they were confined to this make-shift command station for questioning. They cooperated with law enforcement and were not permitted to speak with Ms. Gaines at any time.

9

Detective Stagi spoke frequently throughout the day, even laughing back and forth at certain points. HNT member Sergeant O'Neil testified, however, that Ms. Gaines' behavior became increasingly irrational and paranoid throughout the day. There were times when she would cut off communications but then start talking again.[9] At times she stated that she did not want to hurt anyone, but officers testified that, at other times, she threatened to kill them, making statements like: "I have a gun, you have a gun. The only difference between you and me is I'm ready to die, and you're not[.]" Ms. Gaines referred to the officers as "devils" and said that, if they entered the apartment, she would "ha[ve] no problem shooting them and killing them." Despite repeated attempts at negotiations, she remained barricaded inside with Kodi and refused to put down the shotgun for approximately six hours.

The stand-off lasted from approximately 9:30 a.m. to 3:30 p.m. At 1:30 p.m., Major Wilson, the incident commander located in the mobile unit, ordered the power be shut off. On this very hot August day, the power was cut at 2:45 p.m., which turned off the air conditioning.

Corporal Royce Ruby, a 10-year member of the TacTeam, arrived on the scene mid-morning. His sergeant informed him on the drive over that the situation had arisen from officers attempting to serve a warrant, that a female was barricaded inside with a shotgun

---

[9] Ms. Gaines cut off contact with the HNT for the final time 15 minutes before Corporal Ruby's shot.

10

and a child, and that TacTeam members were already stationed at the two exits (the apartment door and the patio door).

Corporal Ruby's initial role was to organize the TacTeam officers to ensure they could safely set up staging areas and operations and to provide information regarding Ms. Gaines' movement to other specialized teams on the scene. When he arrived, he "suited up" and entered the apartment building. His gear included a ballistic helmet, ballistic vest, gloves, front and back rifle plates, a Glock 35, and an M6 rifle. He was met on the landing by Sergeant Neral, who informed him that Ms. Gaines was suffering from mental illness and had not been taking her medication for "possibly a year."

Corporal Ruby approached the apartment door. When he looked inside, he "could see Ms. Gaines in the hallway area between the opening to the kitchen and the dining room area." She was seated with her legs folded underneath her, "where her butt would be on her feet," with the shotgun "across her legs pointed at the doorway" where the officers were positioned. She remained in this position "throughout the entire event" and "always kept her hand on [the] shotgun." Although the weapon was not raised to a firing position, it was always pointed at the door. Corporal Ruby testified that, from his position, Ms. Gaines could have fired through the apartment door within a second.[10]

Additional tactical officers arrived shortly thereafter and took over the role of coordinating personnel. Corporal Ruby relieved one of the officers at the knob side of the

---

[10] Corporal Ruby testified that, according to the Baltimore County use of force policy, he could have used deadly force "the entire time" he was there.

door.  He testified that he held that position "pretty much all day," i.e., approximately five hours, with the exception of a 20-minute break for "water and a pack of crackers."[11]

Corporal Ruby testified that, although Ms. Gaines was in the same location throughout the incident, she occasionally would stand up to stretch her legs, but she kept the shotgun pointed at the door when she stood.  He was aware that Ms. Gaines was messaging and live-streaming on Facebook throughout the day using her cell phone.  On multiple occasions, she would give the phone to Kodi, who would then come closer to the door, but Corporal Ruby was unable to grab him without making any sudden movements.  Within approximately 30 seconds, Ms. Gaines would yell for Kodi to come back to her side.  Other than these occasions, Kodi was positioned in front of his mother or slightly to her left throughout the day.

The stand-off continued until approximately 3:30 p.m., when Ms. Gaines moved to the kitchen.  Mr. Cunningham testified that Kodi told a therapist that his mother was shot when she went to fix him a peanut butter and jelly sandwich in the kitchen.  Corporal Ruby testified that Ms. Gaines suddenly moved to the kitchen and raised the shotgun to a firing position pointed towards the officers on the hinge side of the doorway.

Corporal Ruby described what happened as follows:

[I]t's right toward the end, almost at the end, and Kodi went into the kitchen. I hadn't observed it all day. In my head I'm thinking, 30 seconds, a minute. I said to the team, I said, "This is different, she's not calling him back. She's

_____

[11] Major Wilson, a superior officer located in the command truck during the stand-off, testified that normal barricades tend to last four to six hours, and after that time, officer fatigue can become a concern.  He stated that, because they were approaching the six-hour mark, he had begun to coordinate relief for the officers (including a cooling truck) when the shot was fired.

12

not calling him back. All day 30 seconds to a minute and he is called back in front of her, this time nothing." A minute, two minutes, three minutes.

Also, I'm getting more movement from her now in this one small period of time than I have all day. She's standing up, she's going right back to that seated position, standing up again. Her feet are moving a lot. I told them, "Something is about to happen. This is different." Then all at once she moved from the position in the hallway into the entrance to the kitchen from the hallway. Now, when she moved, the barrel stayed pointed at the open door, the barrel never went into the kitchen.

Just prior to Ms. Gaines' move into the kitchen, Corporal Ruby was still on the knob side of the door, Officer Callahan was on the hinge side, Sergeant Stephan, Officer Artson, and Sergeant O'Neil were on or at the top of the nearby hallway steps, and Officer McCampbell, Officer Pierce, and Detective Stagi were just inside the doorway of apartment T-3. All officers in the brick-lined hallway were armed and wearing body armor designed to stop projectiles such as shotgun rounds.

In response to Ms. Gaines' relocation, Corporal Ruby moved from his long-held position at the knob side of the T-4 apartment door to the opening of apartment T-2, which provided additional stability for his M6 rifle and a direct line of sight to the kitchen. He testified that Ms. Gaines' change of position into the kitchen gave her a better angle on the officers on the hinge side of the door, so he told those officers to "[t]uck in." Officer Callahan took a "very, very small step backwards" from the hinge side of the door toward the door of apartment T-3, where the others were located, and he tucked his arms in closer to minimize his profile. The officers in the doorway of apartment T-3, which was only a few feet from the hinge side of Ms. Gaines' door, also stepped back slightly further inside the foyer of T-3.

13

Officer Callahan testified that he still felt exposed in this revised position but moving any further back would cause him to lose sight of the section of the apartment he was responsible for covering. Corporal Ruby testified that, although Ms. Gaines would not have a direct shot at Officer Callahan in his new position, his concern was that a bullet would come through the open door, ricochet off the brick walls, and harm officers on the hinge-side of the doorway.

Corporal Ruby testified that, when Ms. Gaines moved into the kitchen, her shotgun was "low ready." Subsequently, however, in a "staggered or incremented" fashion, she raised the shotgun up to the firing position toward the open door where the hinge side officers were positioned. Although Corporal Ruby was the only officer who could see Ms. Gaines, he alerted the other officers that she was aiming the gun at the hallway. Corporal Ruby testified that he told Detective Stagi: "She's got to put that gun down because I'm seeing it come up." Detective Stagi then began yelling at her and "begging her" to put the gun down. Sergeant O'Neil testified that he heard Corporal Ruby say: "She's raising the gun." Sergeant Stephan and Officer Callahan also testified that, just prior to the shot, Corporal Ruby announced that Ms. Gaines' weapon was pointed in the direction of the hallway. Law enforcement notes from the mobile command unit described her behavior in the kitchen as "[h]ighly aggitated" [sic] and that she was "screaming" at the officers that she would shoot.

Corporal Ruby testified that, through the scope of his M6 rifle, from his position in the doorway of apartment T-2, he could see only the barrel of the shotgun and the long braids of Ms. Gaines' hair. Fearing for officer safety, he fired "a head shot," aiming high

14

to avoid hitting Kodi, who he knew was in the kitchen, although he did not know exactly where. The shot was taken from Corporal Ruby's position in the doorway of apartment T-2, through the open apartment doorway of T-4, through the corner of the kitchen drywall, and it struck Ms. Gaines in the kitchen. After he fired his shot, Corporal Ruby saw Ms. Gaines' shotgun move and discharge once.[12]

The team, led by Corporal Ruby, entered the apartment. Corporal Ruby went toward the left entrance of the galley kitchen, the one from the dining room where Ms. Gaines had been throughout the day. Officer Callahan moved to cover the right kitchen entrance, which was next to the living room. Corporal Ruby testified that he was "about one or two steps" into the room when he heard the sound of the shotgun being reloaded, saw the blast go off, and heard the shotgun being reloaded a second time.[13] Corporal Ruby stated that he was then able to see Ms. Gaines, who saw him too and "[brought the] shotgun around," so he "fired three rounds center mass into Ms. Gaines." Ms. Gaines then spun around and slumped in a seated position against the cabinet with her hands off the shotgun. Corporal Ruby grabbed the weapon and placed it outside the kitchen doorway on the floor. Meanwhile, Kodi had run from the kitchen toward the living room area, where Officer

---

[12] There was conflicting testimony about whether Ms. Gaines' first shot was immediate or if there was a pause. Corporal Ruby and Officer McCampbell both testified that Ms. Gaines immediately fired a round after Corporal Ruby's shot (implying that her hand had been on the trigger with the safety off), but other officers testified that there was a pause of approximately 30 seconds, the team entered the apartment, and then Ms. Gaines fired for the first time.

[13] The galley kitchen area had two entrances, one from the dining room (where Ms. Gaines was positioned throughout the day) and a second from the living room.

Callahan grabbed him, sat him down in the living room, and then brought him outside for medical attention.

Corporal Ruby's first shot mortally wounded Ms. Gaines, and it is the only shot at issue on appeal. The bullet entered her back on the left upper side, perforated the left side of her rib cage, her left lung, the thoracic spine, the right lung, the right side of her rib cage, and then exited the right side of her chest. After the bullet struck Ms. Gaines, it ricocheted off the refrigerator and hit Kodi across the cheek. Kodi underwent multiple surgeries to have the bullet fragments removed, and the wound later became infected.[14]

## II.

### Procedural History

On September 13, 2016, Rhanda Dormeus (on behalf of Ms. Gaines' estate, and in her individual capacity as Ms. Gaines' mother), Kareem Courtney (on behalf of his minor child Karsyn Courtney), Corey Cunningham (on behalf of his minor child Kodi Gaines), and Ryan Gaines (Ms. Gaines' father) filed a complaint in the Circuit Court for Baltimore County against Corporal Ruby and Baltimore County alleging wrongful death, a survival action, and violation of rights under the Maryland Declaration of Rights. The complaint was amended on September 21, 2016, to add two additional claims. It was amended a second time on October 11, 2016, to add Officers Dowell and Griffin as defendants. On

---

[14] One of Corporal Ruby's subsequent rounds also ricocheted and hit Kodi in the back of his elbow, which also required multiple reconstructive surgeries. There was extensive trial testimony about the physical and mental trauma that Kodi suffered as a result of this incident.

November 14, 2016, it was amended a third time to add two more defendants (Captain Latchaw and Major Wilson), to include additional claims, and to add Mr. Courtney as a plaintiff in his individual capacity.[15]

The third amended complaint listed the following claims against the various defendants:

Count I          Wrongful Death pursuant to Md. Code Ann. Cts. & Jud. Pro. § 3-904(a) (Against all Defendants)

Count II         Survival Action (Against all Defendants)

Count III        Violation of Maryland Declaration of Rights Articles 10, 24, 26 and 40 (Against all Defendants)[16]

Count IV         Maryland Constitution—Deprivation of Medical Treatment (Against Baltimore County and Corporal Royce Ruby)

Count V          Violation of Maryland Constitution—Bystander Liability (Against all Defendants)

Count VI         Violation of Maryland Constitution—Illegal Entry (Against Officers Griffin and Dowell)

Count VII        Civil Rights Claim pursuant to 42 U.S.C. § 1983 alleging search of Ms. Gaines apartment, excessive force as to Kodi Gaines and Korryn Gaines, and failing to provide medical

---

[15] Major Wilson and Captain Latchaw, superior officers at the scene of the stand-off, were added for their role in the alleged suppression of speech after they ordered a request for Facebook to shut down Ms. Gaines' social media account during the stand-off because she was live-streaming the incident. This claim was dismissed at the summary judgment stage and is not an issue on appeal.

[16] The Maryland Declaration of Rights Articles 10 and 40 establish certain freedom of speech rights, Article 24 establishes due process rights, and Article 26 addresses warrantless searches and seizures. Md. Const. Decl. of Rights, art. 10, 24, 26, 40.

attention (Against all Defendants personally and individually)[17]

Count VIII    Peace Officer Liability pursuant 42 U.S.C. § 1983 (Against Corporal Royce Ruby)

Count IX    Municipal Liability pursuant to 42 U.S.C. § 1983 (Against Corporal Royce Ruby and Baltimore County) (*Monell*[18] claim)

Count X    Excessive Force and Violation of Freedom of Speech in Violation of the First, Fourth and Fourteenth Amendments (Against all Defendants personally and individually)

Count XI    Battery (Against Corporal Royce Ruby)

Count XII    Negligence (Kodi Gaines against All Defendants)

On December 22, 2017, as discussed in further detail, *infra*, the defendants filed a

motion for summary judgment arguing that there was no dispute as to the facts and that

---

[17] 42 U.S.C § 1983 states, in part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

Notably, § 1983 does not create substantive rights, but instead, it provides "a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 749 n.9 (1999) (Souter, J., concurring in part) (quoting *Baker v. McCollan*, 443 U.S. 137, 140, 144 n.3 (1979)).

[18] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

they were entitled to judgment as a matter of law. On January 29, 2018, the circuit court granted the motion as it pertained to all defendants for counts IV, VI and IX, and it dismissed the counts against all defendants except Corporal Ruby and Baltimore County for counts I, II, III, V, VII, X, and XII. The motion for summary judgment was denied as to counts VIII and XI, which had been brought against only Corporal Ruby.

The trial against Corporal Ruby and Baltimore County began on January 30, 2018, and it lasted for three weeks. More than 25 witnesses testified regarding the events that occurred on August 1, 2016, including the parties, medical professionals, ballistics and crime scene experts, family of Ms. Gaines, and other law enforcement officers on the scene.

Dr. Tyrone Powers, appellants' use of force expert, testified that Corporal Ruby's use of force was "excessive and unnecessary," and in violation of the department's policy because there was not an immediate threat of death or serious bodily injury at the time Corporal Ruby took the first shot. In support, Dr. Powers noted that Corporal Ruby did not state in his initial report that he was in imminent danger, but instead, he wrote that he was concerned for the officers on the hinge side of the door. Other officers, however, indicated that no one was at the hinge side of the door.

Dr. Powers also noted that Corporal Ruby said that all he saw was the shotgun barrel and braids from Ms. Gaines' hair, but other witnesses, including appellees' expert, Mr. Key, testified that, if she had been pointing the gun at the hinge side of the door, her hands and another part of her body would have been exposed. Accordingly, based on Corporal Ruby's testimony, that meant that Ms. Gaines could not have been pointing the gun at the hinge side of the door, and therefore, no one was subject to an imminent threat of death or

19

serious bodily injury when the shot was taken. Dr. Powers testified that there was no rush to bring this situation to an immediate end, and based on his conclusion that there was no threat of death or serious bodily injury to the officers, the situation was "inconsistent" with the use of deadly force.

Dr. Powers also relied on the autopsy report to support his conclusion that Ms. Gaines was behind the wall and not pointing the shotgun toward the hinge side of the door. He stated that the fact that Ms. Gaines was shot in the back was consistent with the theory that she was not pointing the shotgun at the door.

Dr. Powers disputed Corporal Ruby's testimony that he saw her raise the shotgun toward the hinge. He initially stated that he was not commenting on Corporal Ruby's credibility, and Corporal Ruby may have seen the shotgun raise up, but he subsequently stated that it was not his belief that Ms. Gaines was raising her weapon. In any event, he testified that the shotgun was not pointed toward the hinge "nor was it putting any officer in immediate threat of danger or serious bodily harm."

Creo Brady, Ms. Gaines' cousin, testified that he spoke with Corporal Ruby right after the incident. He testified that Corporal Ruby told him his justification for the shot was because he was "hot" and "frustrated."

Charles Key, appellees' expert in the use of force, police training, policy and procedures, firearms, incident reconstruction, crime scene analysis and ballistics, testified that Corporal Ruby's use of force was objectively reasonable and consistent with accepted standards of police policy and training because the raised shotgun presented an immediate deadly threat given the circumstances. He testified that, if Corporal Ruby reasonably

20

believed that Ms. Gaines was raising the shotgun, he would have had "no choice but to use lethal force to resolve it." That Kodi was injured did not change the analysis of whether the shot was reasonable because Corporal Ruby made reasonable efforts to prevent injury to Kodi.

Mr. Key testified that, for Ms. Gaines to have been pointing the shotgun at the hinge side of the door, her hands would have been exposed beyond the kitchen wall. Counsel suggested that this was inconsistent with Corporal Ruby's testimony that he could only see Ms. Gaines' braids and the barrel of the shotgun. Mr. Key stated, however, that an officer in Corporal Ruby's situation would be trained to look at the weapon and not at her hands when she was holding the weapon. Mr. Key also testified that, based on the trajectory of the bullet as it entered and exited her body, she could have been aiming the shotgun at the door.

With respect to the fatal shot, Corporal Ruby testified that he fired "because there was no choice anymore," and Ms. Gaines' "shotgun was raised up into a firing position." He stated that the new angle she achieved from the kitchen to the officers in the hallway would have been "devastating to those officers in the entire inside area and myself." His concern was that Ms. Gaines would shoot through the apartment doorway and the bullet would ricochet in the brick hallway, potentially harming any of the officers positioned there.

On cross-examination, counsel noted that Corporal Ruby had not mentioned a concern for ricocheting rounds in his initial statements or deposition. Corporal Ruby agreed that he did not mention potential ricocheting in these statements. Counsel stated

21

that, despite Corporal Ruby's testimony that he took the shot because he feared for officer safety, Officer Artson, Sergeant Stephan, Officer O'Neil, and others testified during their depositions that they were safe in their positions just prior to Corporal Ruby's shot.[19] Corporal Ruby responded that the officers in the hallway area were not safe, and they were all in danger of serious injury or death.

At the end of appellants' case, appellees made a motion for judgment, arguing, *inter alia*, that Corporal Ruby was entitled to qualified immunity because it was objectively reasonable for him to fire the initial shot. The circuit court denied the motion, in part because "whether Officer Callahan was in danger from Corporal Ruby's perspective is a fact that has to be left to the jury."

At the close of all the evidence, appellees renewed their motion for judgment. After hearing argument, the court again denied the motion, stating as follows:

> The Court is not persuaded that qualified immunity applies for this reason, it's an issue of fact. As pointed out in the Plaintiffs' – the Defense seems to suggest that the trier of fact, the jury, is duty bound to accept what Officer Ruby testified to, and that's just not the way it is. There's been evidence in this case that the Plaintiff could argue that in spite of Officer Ruby's

---

[19] Officer Artson testified at his deposition that he was not in danger on the staircase. At trial, however, he clarified that he was referring to danger from direct line of fire, and that he felt he was in danger from potential ricocheting bullets. Sergeant Stephan testified at his deposition that he did not move from his location when Corporal Ruby directed the officers to "get back" because he felt he was "safe." At trial, he testified that he did not move because he felt he was "protected from direct fire." Officer O'Neil testified at his deposition that that the hallway outside the apartment was a "safe location." At trial, however, he testified that it was the "safest possible" location. Officer Callahan's deposition testimony was that he felt safe after he "tucked in" by the door. In response to being confronted with this testimony at trial, he stated that the question was asked within the context of whether he was standing, sitting, or kneeling, and he answered that he felt safe standing. He testified at trial that he "absolutely" did not feel safe from Ms. Gaines in his position at the time the shot was fired.

testimony – Corporal Ruby's testimony, that she was not aiming the gun at the hinge side of the door. So that is a question of fact that must be determined by this jury.

On February 16, 2018, after three hours of deliberation, the jury returned a verdict in favor of appellants and awarded more than $38 million in combined economic and non-economic damages. The completed verdict sheet provided as follows:

1. Do you find by a preponderance of the evidence that the first shot taken by Corporal Royce Ruby on August 1, 2016 was objectively reasonable?

Yes _____                          No ___X___

\* \* \*

2. Do you find by a preponderance of the evidence that the Defendants violated Korryn Gaines' rights under the Maryland Declaration of Rights?

Yes ___X___                          No _____

3. Do you find by a preponderance of the evidence that the Defendants violated Korryn Gaines' rights under 42 USC 1983?

Yes ___X___                          No _____

4. Do you find by a preponderance of the evidence that the Defendants committed a battery on Korryn Gaines?

Yes ___X___                          No _____

5. Do you find by a preponderance of the evidence that the Defendants violated Kodi Gaines' rights under the Maryland Declaration of Rights?

Yes ___X___                          No _____

6. Do you find by a preponderance of the evidence that the Defendants violated Kodi Gaines' rights under 42 USC 1983?

Yes ___X___                          No _____

23

7. Do you find by a preponderance of the evidence that the Defendants committed a battery on Kodi Gaines?

Yes    X                No           

**(If you answered yes any of questions 2, 3, 4, 5, 6, or 7, proceed to determine the monetary damage if any you reward to)**

**Kodi Gaines**

A. For past medical expenses     $23,542.29
B. Non-economic damages     $32,850,000.00

8. In what amount, if any, do you award monetary damages to:

**Ryan Gaines**

A. Non-economic Damages     $300,000.00

9. In what amount, if any, do you award monetary damages to:

**Karsyn Courtney**

A. Non-economic Damages     $4,525,216.32

10. In what amount do you award monetary damages to:

**Rhanda Dormeus**

A. Economic Damages     $7,000 (funeral expenses)
B. Non-economic Damages     $300,000.00

11. In what amount, if any, do you award monetary damages to:

**Estate of Korryn Gaines**

A. Economic Damages     $50,000.00
B. Non-economic Damages     $250,000.00

12. Do you award punitive damages under the Maryland Declaration of Rights?

Yes            No    X   

24

13. Do you award punitive damages under 42 USC 1983?

Yes _____                    No ___X___

On March 12, 2018, as discussed in further detail, *infra*, appellees filed post-trial motions, including a motion for judgment notwithstanding the verdict, remittitur of the verdict, new trial, and a request for the court to exercise revisory power over the judgment. Appellants filed opposition motions on the merits and moved to strike them as untimely. At a hearing held on July 2, 2018, the circuit court rejected appellants' motion to strike, and following arguments by counsel, it held the post-trial motions *sub curia*.

On February 14, 2019, the circuit court issued a Memorandum Opinion and Order ("Opinion" or "Order") granting appellees' motion for judgment notwithstanding the verdict ("JNOV") on the basis that Corporal Ruby was entitled to qualified immunity as a matter of law. Accordingly, the complaint against Corporal Ruby was dismissed. The court also dismissed all counts against Baltimore County, dismissed Count V (bystander liability), and vacated the funeral costs awarded to Ms. Dormeus. In the alternative, the court ruled that, if the JNOV ruling was reversed on appeal to this Court, a new trial was necessary due to a defective verdict. The court made several additional rulings, which will be discussed, *infra*, as relevant to this appeal.

This appeal followed.

## DISCUSSION

## I.

## Motion for Summary Judgment

Appellants' first contention is that the circuit court erred in granting summary judgment on the counts against Officers Dowell and Griffin relating to the initial entry into Ms. Gaines' apartment. Appellees contend that the circuit court properly granted the motion for summary judgment.

## A.

## Proceedings Below

On December 22, 2017, Officers Dowell and Griffin filed a motion for summary judgment asserting, among other things, that they were entitled to judgment as a matter of law on the claims relating to their initial entry into Ms. Gaines' apartment. Specifically, they argued that Counts VI, alleging a violation of the Maryland Constitution based on an illegal entry, and Court VII, alleging a civil rights violation pursuant to 42 U.S.C. § 1983 on the same ground, were barred by collateral estoppel because Mr. Courtney had unsuccessfully challenged the legality of the search at the suppression hearing in the criminal case against him.

In support of this argument, the officers attached to their motion a transcript of the suppression hearing in the prior criminal case. *See Imbraguglio v. Great Atlantic & Pacific Tea Co., Inc.*, 358 Md. 194, 207–08 (2000) (In ruling on a motion for summary judgment,

court may consider transcript of former testimony.).[20] The criminal case was based on evidence found during the execution of a search warrant of the apartment after Ms. Gaines' death, based on Ms. Gaines' assault of the police officers. During the course of the search, the officers saw heroin capsules in plain view, and Mr. Courtney was charged with, among other things, possession and distribution of narcotics. Mr. Courtney filed a motion to suppress this evidence, arguing that the search warrant was tainted by the initial illegal entry.

At the hearing on the motion, Officer Griffin testified that he had arrest warrants for Ms. Gaines and Mr. Courtney.[21] Officer Griffin confirmed that Ms. Gaines was the sole lessee of the apartment. When he and Officer Dowell went to serve the warrants, he repeatedly knocked on the door, identified himself as the police, and heard someone coughing inside. Both Officers Dowell and Griffin testified that, when serving arrest warrants, they usually do not immediately announce that they have a warrant because people will not answer the door. Officer Griffin testified that he did tell Ms. Gaines and Mr. Courtney that he was there to serve arrest warrants at some point, but he said "it wasn't at the beginning" when he was knocking, and it may have been after the door was breached.

---

[20] There is no challenge here to the propriety of attaching this transcript or the court's consideration of it.

[21] Officer Griffin testified, as indicated, that the warrant for Ms. Gaines was due to a failure to appear for trial, and the warrant for Mr. Courtney was for a second-degree assault on Ms. Gaines, who advised the police that Mr. Courtney lived with her. Counsel for Mr. Courtney did not, for the purposes of the motion, dispute that he lived at the apartment.

As Officer Griffin continued to knock, he heard "movement inside the apartment," such as "shuffling of feet" and someone "walking to the door and then walking away." He also stated that he heard a baby cry, a short cry that lasted only a few seconds. He knew from the warrant that Ms. Gaines had two small children, and he expected that someone would be in the house with the baby. Officer Griffin testified that he believed that Ms. Gaines and/or Mr. Courtney were inside the apartment.

The circuit court denied the motion to suppress, noting that an arrest warrant authorizes entry into the home of the subject of the warrant if the officers have reasonable suspicion that the subject of the warrant is in the home. The court noted that there was no dispute that the parties resided together in the home with their child. After the police knocked on the door, they heard shuffling of feet, indicating that someone was there, and they heard a cough and a child cry out. There was no reason to believe that whoever was there was not one of the subjects of the warrant. Based on the totality of the circumstances, the court found that the police had reasonable suspicion that one or both of the subjects of the arrest warrants were in the home.

The officers argued in their motion for summary judgment that, based on the ruling in the criminal case finding that the initial entry was constitutional, appellants were estopped from contesting the constitutionality of the initial entry a second time. Appellants argued that collateral estoppel was inapplicable with respect to the initial entry by Officers Griffin and Dowell for two reasons. First, they asserted that the denial of Mr. Courtney's suppression motion was not essential to the judgment in his criminal case, where he

28

ultimately was acquitted of the drug charges.[22]  Second, they argued that, with respect to the appellants other than Mr. Courtney, they were not parties to the criminal case, and therefore, the initial entry had not previously been litigated with respect to Korryn Gaines, Kodi Gaines, and Karsyn Courtney.

Appellants further argued that, although the officers had not discussed the merits of the initial entry in their motion for summary judgment, their position was that the initial entry was illegal.  They relied on *United States v. Hill*, 649 F.3d 258, 266–67 (4th Cir. 2011), which they asserted stood for the proposition that, to have a reason to believe a suspect is in the home to enter a home to execute an arrest warrant, the police cannot rely solely on an unidentified noise coming from the apartment.  Appellants argued that the entry was illegal because the police entered the apartment without (a) a search warrant, (b) knocking and announcing their presence, or (c) a reasonable belief that Ms. Gaines and Mr. Courtney were home.[23]

On January 29, 2018, the day before trial was scheduled to begin, the circuit court granted the motion for summary judgment.  The court stated that the legality of the entry into Ms. Gaines' apartment was fully litigated in Mr. Courtney's criminal case, and that

---

[22] The State also charged Mr. Courtney in connection with the gun in the apartment, but it nolle prossed those charges.

[23] In the motion, appellants asserted that they disputed the facts set forth in the officers' motion, specifically, that Officer Griffin repeatedly knocked on the door and identified himself as police prior to kicking in the door.  Appellants stated that Mr. Courtney asserted in his deposition, which was attached to the motion, that he was woken up by a loud "boom" of the front door being kicked open, and that Ms. Gaines "had just come from the bathroom when she had heard it."

court found it was lawful. Although Ms. Gaines was not a party to that litigation, the court stated that the legality of the entry was addressed by the court in the criminal case.

The circuit court in this case agreed that, under the circumstances here, where the officers had an address on the warrant and verified the warrant with the apartment rental office, they had more than "just mere noises" inside the house, and the officers had a reasonable belief that the subjects of the warrant were home. As a result, the court granted the motion with respect to the entry, stating:

> Count 6, Maryland constitutional unlawful search and seizure, that's granted. This Court does not find that there was an unlawful search and seizure. That matter has been litigated as -- as previously explained.

> Count 7, civil rights under 42 [USC] 1983 as to all Defendants, including the search and seizure of the apartment, excessive force as to Ms. Gaines, as well as Kodi Gaines, failing to provide medical attention, it's granted to everyone except Corporal Ruby and Baltimore County as to the excessive force.

> As to the suggestion that there's no legal search and seizure of the apartment, that is granted.[24]

## B.

### Parties' Contentions

Appellants contend that the court erred in granting the motion for summary judgment in favor of Officers Griffin and Dowell. They assert that their claim that the entry was unconstitutional was not barred by collateral estoppel based on the contrary

---

[24] The court then granted summary judgment on the other claims, with the exception of Counts I, II, III, V, VII, VIII, X, XI, XII relating to Corporal Ruby and Baltimore County. The court subsequently dismissed the County on Counts VII and X.

finding in Mr. Courtney's state criminal prosecution. They also argue that, based on *Hill*, 649 F.3d at 266–67, the entry was unlawful, asserting that "the fact that Griffin knocked on the door and heard 'people moving closer to the door, like people moving around inside' is of no consequence and does not establish an objectively reasonable belief that the targets of his arrest warrants were present inside." (Internal citation omitted.) Appellants request that this Court reverse the order granting summary judgment with respect to Officers Griffin and Dowell and remand that issue for a trial on the merits.[25]

Appellees contend that the circuit court properly granted the motion for summary judgment. They do not address the issue of collateral estoppel, but they assert that, under the circumstances, the officers reasonably could have concluded that Ms. Gaines and/or Mr. Courtney were in the apartment. In any event, they argue that, because it was not "clearly established" under Fourth Amendment case law that Officers Griffin and Dowell could not enter Ms. Gaines' apartment to serve the arrest warrants, they are entitled to qualified immunity for the entry. Additionally, they assert that the sounds of the child

---

[25] Appellants state that Mr. Courtney disputed the officers' testimony that they knocked and announced their presence, presumably relying on Mr. Courtney's deposition testimony that the police did not knock and announce and that he was not aware they were at the door until he heard the sound of the door being kicked in from the back bedroom. They do not, however, specifically argue, or cite any cases to support an argument, that the court erred in granting summary judgment on this ground. *See James v. City of Detroit*, 430 F.Supp.3d 285, 293 (E.D. Mich. 2019) (Defendants correctly asserted that "an occupant's inability to hear a knock does not create a fact question as to whether one occurred."). Rather, appellants focus their argument on the assertion that the entry was unlawful because the police did not have a reasonable belief that Ms. Gaines and Mr. Courtney were inside. Our focus will be limited to that issue as well.

crying within the apartment provided exigent circumstances, which allowed the officers to

enter the apartment.

## C.

### Standard of Review

Md. Rule 2-501(f) addresses summary judgment, and it provides, in pertinent part:

> The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

The Court of Appeals has described the standard of review for a grant of summary

judgment, as follows:

> On review of an order granting summary judgment, our analysis "begins with the determination [of] whether a genuine dispute of material fact exists; only in the absence of such a dispute will we review questions of law." *D'Aoust v. Diamond*, 424 Md. 549, 574, 36 A.3d 941, 955 (2012) (quoting *Appiah v. Hall*, 416 Md. 533, 546, 7 A.3d 536, 544 (2010)); *O'Connor v. Balt. Cnty.*, 382 Md. 102, 110, 854 A.2d 1191, 1196 (2004). If no genuine dispute of material fact exists, this Court determines "whether the Circuit Court correctly entered summary judgment as a matter of law." *Anderson v. Council of Unit Owners of the Gables on Tuckerman Condo.*, 404 Md. 560, 571, 948 A.2d 11, 18 (2008) (citations omitted). Thus, "[t]he standard of review of a trial court's grant of a motion for summary judgment on the law is *de novo*, that is, whether the trial court's legal conclusions were legally correct." *D'Aoust*, 424 Md. at 574, 36 A.3d at 955.

*Koste v. Town of Oxford*, 431 Md. 14, 24–25 (2013). This Court's review is limited to the

factual record that was before the court pre-trial, when summary judgment was granted.

*Miller v. Bay City Prop. Owners Ass'n, Inc.*, 393 Md. 620, 623 (2006) (quoting

*PaineWebber Inc. v. East*, 363 Md. 408, 413 (2001)) ("An appellate court reviewing a

summary judgment examines the same information from the record and determines the same issues of law as the trial court.").

**Analysis**

**1.**

**Collateral Estoppel**

The circuit court found that appellants were collaterally estopped from relitigating the issue relating to the constitutionality of the initial entry based on the finding of the court in Mr. Courtney's criminal case. As explained below, we disagree.

Collateral estoppel, also known as issue preclusion, bars the re-litigation of an issue decided in a prior adjudication if that issue was (1) "identical to the issue to be decided in the present action"; (2) "there was a final judgment on the merits in the prior adjudication"; (3) "the party against whom the doctrine is asserted was a party to the prior adjudication or was in privity with a party to the prior adjudication"; and (4) "the party against whom the doctrine is asserted had a fair opportunity to be heard on the issue in the prior adjudication." *Clark v. Prince George's County*, 211 Md. App. 548, 581, *cert. denied*, 434 Md. 312 (2013). Collateral estoppel applies in both criminal and civil cases. *Cook v. State*, 281 Md. 665, 668, *cert. denied*, 439 U.S. 839 (1978).

Here, there is no dispute that the first and third requirements were satisfied with respect to Mr. Courtney. The challenge to the initial entry by Officers Griffin and Dowell was identical in both Mr. Courtney's criminal case and the present case, and Mr. Courtney was a party in the prior criminal case.

33

Appellants argue, however, that collateral estoppel does not bar relitigation of the issue relating to the constitutionality of the initial entry because they did not have a fair opportunity to litigate the claim, relying solely on *Prosise v. Haring*, 667 F.2d 1133 (4th Cir. 1981), *aff'd*, 462 U.S. 306 (1983). In *Prosise*, 667 F.2d at 1137, the court noted the general proposition that collateral estoppel might apply to defeat a § 1983 constitutional claim because the dispositive issue had previously been decided in a prior criminal action. The court held, however, that Prosise's state court guilty plea regarding controlled dangerous substances ("CDS") found in his home did not have preclusive effect on his subsequent § 1983 claim alleging an illegal search and seizure because his Fourth Amendment claim was not actually litigated in the criminal action. *Id.* at 1138, 1140–41. The United States Supreme Court affirmed this ruling, noting that the legality of the search was not actually litigated in the criminal proceeding, and indeed, no issue was "actually litigated" because Prosise declined to contest his guilt. *Prosise*, 462 U.S. at 316.

Here, by contrast, Mr. Courtney's contention regarding the initial entry into the apartment was actually litigated, and the criminal court found that it was lawful. In this situation, where the issue of the entry was actually litigated, appellants' reliance on *Prosise* is misplaced.

Mr. Courtney's criminal case, however, resulted in an acquittal of the CDS charges. Because Mr. Courtney was acquitted, he could not seek appellate review of the suppression ruling. When a defendant is acquitted of criminal charges and there is no ability to seek appellate review of a pretrial suppression ruling, the suppression ruling is not sufficiently final to be used against the defendant for collateral estoppel purposes. *See Johnson v.*

34

*Watkins*, 101 F.3d 792, 795–96 (2d Cir. 1996) ("[F]acts determined in pretrial suppression hearing cannot be given preclusive effect against a defendant subsequently acquitted of charges" because the defendant lacks "an opportunity to obtain review of an issue decided against him.");[26] *People v. Howard*, 152 A.D.2d 325, 329 (N.Y. App. Div. 1989) (Suppression ruling is not sufficiently final for collateral estoppel purposes when the defendant is acquitted and cannot seek appellate review of the ruling.); *see also Cook*, 281 Md. at 674–75 (Order suppressing evidence at trial terminating in mistrial was not sufficiently final to preclude State from litigating issue at subsequent trial based on collateral estoppel, noting that a ruling should not be treated as final where the party against whom preclusion is sought did not have the opportunity to have the issue decided by an appellate court.); *Glover v. Hunsicker*, 604 F.Supp. 665, 666 (E.D. Pa. 1985) (quoting *Jones v. Saunders*, 422 F.Supp. 1054, 1055 (E.D. Pa. 1976)) (An acquitted defendant is not barred from litigating a violation of constitutional rights based on a prior order denying a motion to suppress because that "would deprive a plaintiff of an opportunity for a definitive determination of important federal rights for the vindication of which the Civil Rights Act [was] specifically designed[.]").

Because Mr. Courtney did not have the opportunity to appeal the denial of the motion to suppress based on the entry to the home, there was no judgment sufficiently final to preclude him from relitigating the issue in his civil suit. Moreover, appellants other than

---

[26] As indicated, other charges involving the gun were nolle prossed. A nolle pros does not result in a final judgment with regard to collateral estoppel. *Butler v. State*, 91 Md. App. 515, 538 (1992), *aff'd*, 335 Md. 238 (1994).

Mr. Courtney were not parties to the criminal case that the State brought against Mr. Courtney, and for that additional reason, they did not have a full opportunity to be heard on the issue. Accordingly, the circuit court erred in finding that collateral estoppel precluded appellants from litigating the constitutionality of the initial entry.

## 2.

### Propriety of the Entry

On the merits, appellants contend that the circuit court erred in granting the motion for summary judgment filed by Officers Griffin and Dowell. They assert that the initial entry was unconstitutional under the Fourth Amendment and the Maryland Constitution "because the officers neither established an objectively reasonable belief nor probable cause that either [Ms.] Gaines or [Mr.] Courtney were present inside when they obtained the keys from the rental office and warrantlessly kicked in the front door."[27] They argue that the officers' testimony regarding "signs of life" in the apartment may have established that someone was in the apartment, but it did not establish a reasonable belief that Ms. Gaines or Mr. Courtney was inside.[28]

---

[27] The entry occurred when the officers first opened the door using the key to unlock it.

[28] Although appellants assert that there were disputes of fact preventing summary judgment, none of those facts are relevant to the issue on appeal, i.e., whether the officers possessed a reasonable belief that the couple was home prior to the entry. Appellants did not contest at the summary judgment motion that the police heard noises emanating from the apartment.

Appellees contend that the circuit court properly granted the motion for summary judgment. They assert that the entry was constitutional because the officers had a reasonable belief that Ms. Gaines or Mr. Courtney was in the apartment.[29] They also argue that the officers had qualified immunity with respect to the § 1983 claim under the Fourth and Fourteenth Amendments because there was no clearly established law that they could not forcibly enter the apartment to serve the arrest warrants.

In assessing the constitutionality of the initial entry, based on the complaint filed, we must determine if the entry was constitutional pursuant to the Fourth Amendment to the United States Constitution and Article 26 of the Maryland Constitution. The Fourth Amendment, made applicable to the states by the Fourteenth Amendment, provides, in relevant part, that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. With respect to the Maryland Constitution, Maryland courts generally have construed Article 26 to provide protection consistent with that given by the Fourth Amendment. *King v. State*, 434 Md. 472, 485 (2013) (Although the court has stated "that Article 26 may have a meaning independent of the Fourth Amendment, we have not held, to date, that it provides greater protection against state searches than its federal kin.").[30]

---

[29] Alternatively, they assert that, because they heard a child cry and no adult responded to the door, they reasonably concluded that a child needed assistance, and the entry was reasonable under the community caretaking exception.

[30] Article 26 provides

37

Qualified immunity does not apply to Maryland state constitutional claims, i.e., Count VI. *See Williams v. Prince George's County*, 112 Md. App. 526, 546 (1996).

We begin with the argument that the officers had qualified immunity for the § 1983 claims. The Supreme Court has stated that qualified immunity shields government officials performing discretionary functions from civil damages liability "so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). *Accord Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action."). The Supreme Court has held that a defense of qualified immunity provides protection to "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986), and *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). *Accord Waterman v. Batton*, 393 F.3d 471, 476 (4th Cir. 2005). The Court of Appeals has explained that qualified immunity results from a balancing of competing interests. "The need to provide a legal means to vindicate a citizen's federally recognized rights when they are transgressed by government actors is

---

[t]hat all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

Md. Const. Decl. of Rts. art. 26.

measured against the costs of necessarily inhibiting government officials in the discharge of their occupational duties, including the time spent defending unfounded claims." *Okwa v. Harper*, 360 Md. 161, 198 (2000).

Courts generally have employed a two-part test to determine whether an official is entitled to qualified immunity. *Pearson*, 555. U.S. at 232. To overcome a qualified immunity defense, the plaintiff must show that (1) the facts alleged or shown by the plaintiff "make out a violation of a constitutional right"; and (2) the right was "'clearly established' at the time of the defendant's alleged misconduct." *Id.* at 232, 236.

We address first whether there was a violation of a constitutional right, i.e., whether the police violated Ms. Gaines' and Mr. Courtney's Fourth Amendment rights when they entered the apartment pursuant to the arrest warrants. "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980). Entering a home to conduct a search or seizure without a warrant, therefore, is presumptively unreasonable. *Id.* at 586.

When the police have an arrest warrant, however, entry into a residence may be permitted. An arrest warrant "founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* at 603. To determine whether the police reasonably entered a residence based on an arrest warrant, there is a two-part test. First, an officer must have reason to believe that "the location is the defendant's residence." *Hill*, 649 F.3d at 262. Second, the police must have a reasonable belief that the subject of the warrant is inside the residence. *Id.*

39

Here, the first step in the analysis was easily satisfied. It was undisputed that the address listed on the warrant was Ms. Gaines' primary residence, and Officer Griffin testified that he went to the rental office for the apartment complex a week earlier and confirmed that she was the lessee. He testified that Ms. Gaines had advised that Mr. Courtney lived at the residence.

We thus turn to the second step, whether the officers had an objectively reasonable belief that Ms. Gaines was home at the time.[31] *Id.* In reviewing this question, our review is *de novo*. *See United States v. Bohannon*, 824 F.3d 242, 248 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 628 (2017).

This question is a closer one, so we must address the scope of the "reason to believe" standard. Is it equivalent to probable cause, reasonable suspicion, or something else?

The federal circuits are split on what the standard "reasonable belief" or "reason to believe" encompasses in this context. *Hill*, 649 F.3d at 262–63. The Fifth, Sixth, Seventh, and Ninth Circuits have indicated that reasonable belief is equivalent to probable cause. *United States v. Jackson*, 576 F.3d 465, 469 (7th Cir.), *cert. denied*, 558 U.S. 1062 (2009); *United States v. Hardin*, 539 F.3d 404, 416 n.6 (6th Cir. 2008); *United States v. Barrera*, 464 F.3d 496, 501 n.5 (5th Cir. 2006); *United States v. Gorman*, 314 F.3d 1105, 1114 (9th Cir. 2002). The First, Second, Tenth, and D.C. Circuits, by contrast, have indicated that "the requirements of reasonable belief are something less than probable cause." *Hill*, 649

---

[31] "Reasonable belief" is generally synonymous with "reason to believe." *See United States v. Hardin*, 539 F.3d 404, 410 (6th Cir. 2008); *United States v. Gorman*, 314 F.3d 1105, 1111 (9th Cir. 2002).

F.3d at 263. *Accord Bohannon*, 824 F.3d at 255 ("[R]eason to believe is not a particularly high standard" and requires "more than a hunch as to presence, but less than a probability."); *United States v. Werra*, 638 F.3d 326, 337 (1st Cir. 2011); *United States v. Thomas*, 429 F.3d 282, 286 (D.C. Cir. 2005) ("[T]he Supreme Court in *Payton* used a phrase other than 'probable cause' because it meant something other than 'probable cause.'"), *cert. denied*, 549 U.S. 1055 (2006); *Valdez v. McPheters,* 172 F.3d 1220, 1227 n.5 (10th Cir. 1999).

Many state courts, on the other hand, have held that reasonable belief, in the context of entering a suspect's dwelling to execute an arrest warrant, does not rise of the level of probable cause. *See*, *e.g.*, *People v. Downey*, 130 Cal.Rptr.3d 402, 408–09 (Cal. Ct. App. 4th 2011); *Barrett v. Commonwealth*, 470 S.W.3d 337, 342 (Ky. 2015) (Entry requires only reasonable belief that suspect is home.), *cert. denied*, 136 S. Ct. 1208 (2016); *Commonwealth v. Silva*, 802 N.E.2d 535, 541 (Mass. 2004) (Reasonable belief, and not probable cause, is the proper standard.); *State v. Paige*, 77 A.D.3d 1193, 1194 (N.Y. App. Div. 2010) ("The reasonable belief standard is less stringent than the probable cause standard[.]"), *aff'd*, 16 N.Y.3d 816 (2011); *State v. Turpin*, 96 N.E.3d 1171, 1179 (Ohio Ct. App. 2017) (quoting *State v. Cooks*, 2017 WL 275790, ¶ 10 (Ohio Ct. App. Sept. 1, 2017)) ("[P]olice officers do not need probable cause to enter a residence to execute an arrest warrant provided they have a reasonable belief" the suspect resides there and is present.). *But see State v. Smith*, 90 P.3d 221, 224 (Ariz. Ct. App. 2004) ("[R]eason-to-believe standard requires a level of reasonable belief similar to that required to support probable cause.").

In *Taylor v. State*, 448 Md. 242 (2016), *cert. denied*, 137 S. Ct. 1373 (2017), the Court of Appeals addressed the reason to believe standard in a different context. In that case, the court addressed the authority of the police to search a car incident to arrest when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Id.* at 248 (quoting *Arizona v. Gant*, 556 U.S. 332, 343 (2009)). In addressing what the term "reason to believe" meant, the Court stated:

> We conclude that the "reasonable to believe" standard is the equivalent of reasonable articulable suspicion because we cannot discern any logical difference between the two. If a police officer has a reasonable suspicion that he or she can articulate that something is so, then perforce it is reasonable for the officer to believe that it may be so and *vice versa*. But that suspicion, to be reasonable, must have some basis in fact.

*Id.* at 250.

Based on our review of the case law, we are persuaded, consistent with the majority of state courts addressing the reasonable belief standard in the context of an entry into the home pursuant to an arrest warrant, that the "reason to believe" standard does not rise to the level of probable cause. Rather, we hold, consistent with the decision in *Taylor*, that the term "reason to believe" in the context of the execution of an arrest warrant is akin to reasonable suspicion. The standard requires "more than a hunch as to presence, but less than a probability." *Bohannon*, 824 F.3d at 255. "Reasonable belief is established by looking at common sense factors and evaluating the totality of the circumstances." *United States v. Pruitt*, 458 F.3d 477, 482 (6th Cir. 2006), *cert. denied*, 549 U.S. 1283 (2007).

In assessing whether the officers here had a reasonable belief that Ms. Gaines was in the residence, we note that Officers Griffin and Dowell had confirmed that Ms. Gaines

resided at the apartment, and when they knocked on the door, they heard noises indicating that someone was coming up to the door and moving things, a brief baby cry, and the sound of someone coughing inside. These circumstances, in the absence of facts indicating that Ms. Gaines would not be home, provided a reasonable belief that Ms. Gaines or Mr. Courtney, who the police knew had children, was inside the residence. *See United States v. Gay*, 240 F.3d 1222, 1227 (10th Cir. 2001) (Reasonable belief that suspect would be home when police knocked and heard a "thud" inside, suggesting that "a person was inside the duplex at the time."), *cert. denied*, 533 U.S. 939 (2001); *United States v. Route*, 104 F.3d 59, 62–63 (5th Cir.) (Using mail and bills, police confirmed that suspect lived at the house and had a reasonable belief he was home because police could hear television on inside and a car was in the driveway.), *cert. denied*, 521 U.S. 1109 (1997). *See also Barrett*, 470 S.W.3d at 343 (Police had reasonable belief suspect was home because they knew he resided there, and when they arrived, they heard sounds of voices and movement inside that changed when the officers knocked.).

Appellants argue that the unlawfulness of the initial entry "is controlled by" *Hill*, 649 F.3d at 264–65, particularly the court's statement that the "police cannot solely rely on an unidentified and unresponsive noise coming from within the home to enter for purposes of executing an arrest warrant." The facts in *Hill*, however, are significantly different from those in this case.

In *Hill*, 649 F.3d at 261, the police had a warrant for Hill's arrest with an address unknown. They went to his girlfriend's residence, but based on a prior conversation with the girlfriend, the officer who went to the residence testified that he thought there was an

43

80% chance that Hill would not be at the residence. *Id.* The police went there to communicate with Hill's girlfriend about "Hill's whereabouts." *Id.* The officers knocked on the door and heard "unresponsive noises" that could have been the television or voices. *Id.* They called the girlfriend, who stated that the only person who could be in the home at the time was her sister. *Id.* at 263–64. They entered the residence and found Hill. *Id.*

Under these facts, the court held that the police did not have a reasonable belief that Hill was inside the residence. *Id.* at 263. The court stated that, "at best, the police had reason to believe that someone was present and the individual inside was [the girlfriend's] sister." *Id.* at 264.

The facts in *Hill*, where the police testified that, when they went to the house, they did not think Hill would be there, and when they heard noises, they were advised in a call to the person who lived there that Hill was not there, are not at all similar to the facts in this case. *See also V.P.S. v. State*, 816 So.2d 801, 803 (Fla. Dist. Ct. App. 2002) (No reasonable belief in part because officers were told the suspect was not there.). Contrary to appellants' arguments, the reasoning in *Hill* does not control this case.

Here, the police were advised that Ms. Gaines and Mr. Courtney lived at the residence. They heard people moving in the apartment and the sounds of a child crying inside. Under these circumstances, in the absence of information to the contrary, it was reasonable to believe that Ms. Gaines and/or Mr. Courtney were present inside the residence. Accordingly, the circuit court properly found that the entry was constitutional, and it properly granted summary judgment on the claims based on the initial entry (Count VI and paragraph 88 of Count VII).

44

Our resolution in this regard addresses both the state constitutional claims and the first part of the qualified immunity test for the § 1983 claims. We further hold that, even if the initial entry was a violation of the Fourth Amendment, such a violation was not "clearly established" at the time of the entry. Thus, summary judgment was appropriate on the § 1983 claims for this additional reason.

## II.

## Post-Trial Motions

Appellants contend that the circuit court erred in granting appellees' motion for judgment notwithstanding the verdict, or in the alternative, a new trial. Appellees, not surprisingly, disagree.

## A.

## Circuit Court Proceedings

On March 12, 2018, after the jury rendered its verdict finding that the first shot taken by Corporal Ruby was objectively unreasonable, appellees filed motions for judgment notwithstanding the verdict, remittitur of the verdict, new trial, and for the court to exercise revisory power over the judgment. Appellees argued that Corporal Ruby's first shot was objectively reasonable as a matter of law, and therefore, he was entitled to judgment. They asserted that there was no violation of the rights of Ms. Gaines or her son, an innocent bystander, under § 1983 or the Maryland Declaration of Rights, nor was any battery committed against them. Additionally, they argued that Corporal Ruby was entitled to qualified immunity because he did not violate any statutory or constitutional right of which a reasonable officer would have known.

45

Appellees also argued that Ms. Dormeus, Mr. Gaines, and Karsyn could not recover under a wrongful death claim because the reasonableness of the shot meant that Ms. Gaines' death was not wrongful. They further asserted that Md. Code (2013 Repl. Vol.), § 3-904(c)(2) of the Courts and Judicial Proceedings Article permits beneficiaries under a wrongful death claim to receive damages only when directed by the verdict, and the jury in this case was never asked to make a finding regarding wrongful death or to apportion those damages.

Appellees next argued that a new trial was warranted for two reasons. First, they asserted that the verdict sheet was deficient and resulted in an irreconcilably inconsistent verdict because it did not separate out the damages for the state law claims, which are capped under the Local Government Tort Claims Act ("LGTCA"),[32] from the federal law

---

[32] The LGTCA [Local Government Tort Claims Act] is a defense and indemnification statute, *Hines v. French*, 157 Md. App. 536, 571, 852 A.2d 1047 (2004), the purpose of which in part is "to limit the liability of local governments and require them to provide a defense to their employees under certain circumstances." *Williams v. Prince George's County*, 112 Md. App. 526, 553, 685 A.2d 884 (1996). Section 5-302(a) of the LGTCA states that a local government must provide a legal defense for its employees in tort actions alleging tortious conduct "within the scope of employment with the local government." Section 5-303(b)(1) then provides that, except for punitive damages, a local government is liable for any judgment against its employee for damages from tortious conduct "committed by the employee within the scope of employment with the local government." Under the LGTCA, the local government also may not assert governmental or sovereign immunity to avoid its duty to defend or indemnify its employees. LGTCA § 5–303(b)(2).

*Edwards v. Mayor & City Counsel of Balt.*, 176 Md. App. 446, 457–58 (2007).

46

claims, which are not subject to a cap.[33]   Second, appellees argued that the damages

awarded were excessive and against the weight of the evidence, and therefore, a new trial

or a remittitur was warranted.

Appellants filed oppositions to these post-trial motions, arguing that the motion for

JNOV must be denied because the jury properly found that Corporal Ruby's shot was

objectively unreasonable.  They argued that Kodi had properly pled and proceeded on his

§ 1983 claim regarding bystander liability pursuant to the Fourteenth Amendment, even if

he could not bring it pursuant to the Fourth Amendment.  They asserted that Corporal Ruby

committed battery against Kodi, arguing that the transferred intent doctrine applied because

Corporal Ruby intended to shoot Ms. Gaines and that action was unlawful.  They further

argued that Ms. Dormeus, Karsyn, and Mr. Gaines could recover for wrongful death

because there was ample evidence to show that the first shot was fatal.

Appellants disputed appellees' argument that a new trial or a remittitur was

warranted because the jury verdict was inconsistent.  They noted that they had proposed a

verdict sheet that listed separate damages for each count, but appellees objected, and the

parties then agreed to a new verdict sheet drafted by the court.  Appellants argued that the

court "should simply apply the damage cap where appropriate, and leave the damages

intact[.]"  They also asserted that the non-economic damage awards were not excessive

---

[33] Md. Code Ann. (2013 Repl. Vol.), § 5-303 of the Courts and Judicial Proceedings Article ("CJP") provides that "the liability of a local government may not exceed $400,000 per an individual claim, and $800,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions[.]"  *See Espina v. Prince George's County*, 442 Md. 311, 323 (2015).

and were supported by the record, and therefore, a remittitur or new trial on this ground was not appropriate.

In addition to their opposition to appellees' post-trial motions on the merits, appellants filed a motion to strike the motions as untimely. They argued that judgment was entered by the circuit court on February 22, 2018, and therefore, the deadline to file post-trial motions was March 5, 2018, i.e., 10 days after judgment was entered. Because appellees filed the motions on March 12, 2018, appellants argued that the motions were untimely.

Appellees filed an opposition to appellants' motion to strike, asserting that the post-trial motions were timely filed. They argued that judgment was not entered on February 22, 2018, but rather, the judgment was entered on March 2, 2018, the date the judgment was signed, indexed, issued, and entered into the court's case management system docket.[34]

The circuit court held a hearing on the motions on July 2, 2018. The parties began with the timeliness issue. Appellees noted that the docket entries stated that the judgment was indexed on March 2, 2018, and this entry contained a note that stated: "UCS automatic generated docket entry pulled the Judgment entry date of 2/22/18 for the description in error; the corrected date is the Judgment indexed on 3/2/18."

The circuit court found that the post-trial motions were timely filed, stating as follows:

---

[34] On May 29, 2018, the circuit court granted appellees' motion to stay enforcement of judgment, and the matter was held *sub curia* pending the consideration of the post-trial motions at the July hearing.

48

The Motion to Strike the Motion for Failure to Timely File is denied. I can't explain it. The clerk of the Court made an error. This Court did not sign the judgment until March 2nd. That is the effective date. The clerk of the Court has no authority to send out a notice of judgment until the judge signs the judgment. That is the Court's ruling on that issue.

The court then heard arguments by counsel on the merits.

## B.

## Circuit Court Memorandum and Order

On February 14, 2019, the circuit court issued a 75-page Memorandum Opinion and Order granting the motion for JNOV. In the alternative, the court ordered that, if the JNOV was not upheld on appeal, the court granted appellees' request for a new trial based on an inconsistent verdict.

The court began its discussion with the motion for JNOV and appellees' request that Baltimore County be dismissed from the action. As discussed in more detail, *infra*, the court dismissed the claims against the County.

The court then found that Corporal Ruby was entitled to qualified immunity because he did not violate Ms. Gaines' constitutional right, and even if he did, there was no "'clearly established' prohibition at the time he shot Ms. Gaines." The court summarized the situation confronting Corporal Ruby as follows:

Corporal Ruby was faced with Gaines who was armed with a shotgun; had threatened police officers with that shotgun, who had an outstanding arrest warrant; who was suspected of having undisclosed mental health issues, for which she had not taken medication for a year; who refused to surrender herself to lawful arrest, even after one of her children, Karsyn Courtney, and that child's father, Kareem Courtney, had surrendered; who for hours resisted arrest and then abruptly moves to a place of cover and concealment and raises her shotgun in the direction of the police officers.

49

In determining that Corporal Ruby's shot was reasonable, and therefore, not a violation of Ms. Gaines' Fourth Amendment right against unlawful seizure, the court stated that there was no evidence contradicting Corporal Ruby's testimony that Ms. Gaines raised the shotgun to a firing position or that he believed her actions endangered others. Moreover, the court found "as a fact" that Ms. Gaines discharged the shotgun immediately after Corporal Ruby's first shot, which supported Corporal Ruby's testimony that "the immediacy of that response indicated that the shotgun was loaded ready to fire." The court stated that, even if Corporal Ruby was "wrong about her pointing the shotgun at the officers on the hinge side of the door, the physical evidence [was] that she was raising her shotgun." Accordingly, the court found that Corporal Ruby's actions were objectively reasonable and did not violate Ms. Gaines' Fourth Amendment rights against unlawful seizure. Additionally, based on the court's finding that the shooting of Ms. Gaines, although tragic, was not unlawful, the court vacated the findings of battery on Ms. Gaines and Kodi. And, because there was "no other bystander potentially liable," the court granted judgment on Count V.

Turning to the second prong of the qualified immunity test for the § 1983 claims, the court found that Corporal Ruby's actions did not violate clearly established constitutional prohibitions at the time of the seizure. Quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012), the court stated that "[a] clearly established right is one that is 'sufficiently clear that every reasonable officer would have understood that what he is doing violates that right.'" The court rejected the argument that the cases relied on by appellants: *Pena v. Porter*, 316 Fed.Appx. 303 (4th Cir. 2009); *Connor v. Thompson*, 647

50

Fed.Appx. 231 (4th Cir. 2016); and *Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013) presented sufficiently similar factual scenarios to create a clearly established prohibition to Corporal Ruby's actions.

The court found that Corporal Ruby was entitled to qualified immunity because his conduct did not violate "clearly established" constitutional rights. Accordingly, the court granted the motion for judgment notwithstanding the verdict and dismissed the complaint against Corporal Ruby.

In the event that its ruling granting JNOV did not withstand appellate scrutiny, the court's opinion next addressed appellees' motion for new trial based on an "irreconcilably inconsistent" jury verdict. Initially, the court rejected appellants' argument that appellees waived their right to challenge the verdict sheet because, although they agreed to the form of the verdict sheet, they presented the issue in the post-trial motions.

The court then granted the motion for a new trial on the ground that the verdict was inconsistent. Although acknowledging that the verdict was not logically inconsistent, the court stated that the verdict was defective because the jury did not apportion the award between the state law claims (battery and violation of the Maryland Declaration of Rights), which were subject to a damages cap, and the federal § 1983 claims, which were not subject to any damages cap. Accordingly, the court concluded that appellees were entitled to a new trial.

Finally, the court discussed appellees' request that it remit the verdict. The court found "that the non-economic damages awarded to the various Plaintiffs [were] excessive and shock[] the conscience, and but for this [c]ourt dismissing the matter for grant of

qualified immunity, or in the alternative granting a new trial because of the defective verdict, the [c]ourt would remit the [jury's] awards."

The Order accompanying the Memorandum Opinion, provided as follows:

> **ORDERED**, that the Third Amended Complaint is dismissed against Baltimore County, Maryland. It is further
>
> **ORDERED**, that Count V of the Third Amended Complaint, Bystander Liability, is dismissed in its entirety. It is further
>
> **ORDERED**, that the economic damages of $7,000.00 awarded to Rhanda Dormeus is vacated. It is further
>
> **ORDERED**, that the Defendants['] request for Judgment Notwithstanding the Verdict is Granted and the Complaint against Defendant Royce Ruby is dismissed. It is further
>
> **ORDERED** that should the Court's ruling granting JNOV not withstand appellate scrutiny, for the reasons stated in the Memorandum Opinion, the Court grants the Defendants a new trial.

## C.

### Timeliness of Post-Trial Motions

Appellants contend that the circuit court erred in finding that appellees' post-trial motions were timely filed pursuant to Md. Rules 2-532 and 2-533.[35] Rule 2-532(b) provides that a motion for judgment notwithstanding the verdict "shall be filed within ten days after entry of judgment on the verdict," and Rule 2-533(a) provides that a motion for new trial may be filed "within ten days after entry of judgment." The jury rendered its verdict on February 16, 2018.

---

[35] The circuit court did not rule on the Rule 2-535 motion to revise, and therefore, that motion is not before us on appeal.

Appellants argue that the clerk entered the judgment on February 22, 2018. Appellees did not file their motions until March 12, 2018, which appellants argue was 17 days after the entry of judgment, in violation of the 10-day deadline.

Appellees argue that the circuit court properly found that their post-trial motions were timely filed. They assert that the judgment was not final until it was signed by the judge on March 2, 2018, noting that the docket entry for February 22, 2018, states "Judgment to be entered."

We agree that judgment was entered on March 2, 2018, and therefore, appellees' post-trial motions filed on March 12, 2018, were timely filed. Rule 2-601(a) provides that "[e]ach judgment shall be set forth on a separate document" and be signed by a judge or the clerk of the court. Subsection (a) also provides that "[u]pon a verdict of a jury or a decision by the court allowing recovery only of costs or a specified amount of money or denying all relief, the clerk shall forthwith prepare, sign, and enter the judgment, unless the court orders otherwise." *See Hiob v. Progressive American Ins. Co*., 440 Md. 466, 479 (2014) (In cases denying all relief, the clerk may prepare and sign the judgment, but in more complex judgments, a judge's signature is required.). Rule 2-601(b) provides that the "clerk shall enter a judgment by making an entry of it on the docket of the electronic case management system."

Here, the circuit court stated that the clerk made an error in initially entering the judgment on February 22, 2018. It stated that it did not sign the judgment until March, and the clerk had no authority to enter judgment before that time. The docket entries support the court's statement. The docket entry for March 2, 2018, says "automatic generated

53

docket entry pulled the Judgment entry date of 2/22/18 for the description in error; the correct date is the Judgment indexed on 3/2/18." Based on this docket entry, stating that the entry date of February 22, 2018, was "in error" and the "correct date" was March 2, 2018, in light of the goal of Rule 2-601 to make the date of entry of judgment clear, *see Won Bok Lee v. Won Sun Lee*, 466 Md. 601, 635 (2020), the date of entry of judgment was March 2, 2018. Accordingly, the circuit court properly found that appellees' motions filed on March 12, 2018, were timely filed pursuant to Md. Rule 2-532 and 2-533.

We now turn to the merits of the post-trial motions.

### D.

### Judgment Notwithstanding the Verdict

### 1.

### Parties' Contentions

Appellants contend that the circuit court erred in granting JNOV on the basis of qualified immunity. They argue that the court "ignored facts supporting [a]ppellants, made unauthorized factual findings, and did not consider the evidence in the light most favorable to [a]ppellants as [the court] was required to do." Appellants note that, on three separate occasions prior to the verdict, the court declined to grant judgment to appellees, stating that the reasonableness of Corporal Ruby's shot was a question for the jury.

Although Corporal Ruby testified that he fired the first shot because Ms. Gaines raised her shotgun into a firing position that made him fear for officer safety, appellants contend that the jury could have concluded, based on the evidence, that Corporal Ruby was not being truthful. They assert that there were two issues for the jury to address in deciding

54

whether Corporal Ruby's first shot was objectively reasonable: (1) whether Ms. Gaines raised her gun and was pointing it at the door when Corporal Ruby fired the first shot; and (2) whether the officers in the hallway were in danger of death or serious bodily harm at the time. Appellants argue there was significant evidence to contradict Corporal Ruby's testimony that she raised her shotgun, and the circuit court, in granting JNOV, "created [its] own findings from [its] trial notes or memory, ignored evidence favoring [a]ppellants, or simply accepted Ruby's testimony [as true]."

Appellees argue that the circuit court properly granted JNOV in their favor. They assert that Corporal Ruby was entitled to qualified immunity on all the § 1983 claims, that the shooting of Ms. Gaines was constitutional under Article 24 and 26 of the Maryland Declaration of Rights because it was reasonable, and, because the shooting was lawful, the court correctly dismissed the battery claims of Ms. Gaines and Kodi.[36]

Appellees assert that police use of deadly force is authorized under the Fourth Amendment where the officer has probable cause to believe that the suspect poses a threat of harm to the officer or others. They note that the only witness to the shooting to testify was Corporal Ruby. They argue that his testimony that Ms. Gaines raised her shotgun to a firing position, which he believed threatened his safety and that of others, was undisputed. Appellees assert that, given these undisputed facts, any reasonable officer would have

---

[36] Appellees also argue that the court properly granted JNOV on the state constitutional claims for Kodi, Karsyn, Mr. Courtney, or the Gaines family relating to the shooting because they were not the intended target of the shooting, and therefore, they were not seized. Appellants did not respond to this argument in their reply briefs.

concluded that Ms. Gaines posed an imminent deadly threat, and therefore, his shot was reasonable under the Fourth Amendment. Additionally, they argue that Corporal Ruby "is entitled to qualified immunity because his actions at the time he took them did not violate clearly established statutory or constitutional rights, of which *every* reasonable officer would have known."[37] (Emphasis in original.)

With respect to the injury to Kodi, appellees argue that a "Fourth Amendment violation *does not* occur for an innocent bystander who *is not* the intended target of a seizure." [38] (Emphasis in original.) Here, they argue, it was clear that Kodi was not the intended target, and Fourth Amendment rights cannot be asserted vicariously.

## 2.

## Standard of Review

This Court reviews a circuit court's order granting a motion for judgment notwithstanding the verdict under a *de novo* standard of review. *Marrick Homes LLC v. Rutkowski*, 232 Md. App. 689, 697 (2017). As we have explained:

> [W]e focus on whether the [appellants] presented evidence that, taken in the light most favorable to the nonmoving party, legally supported their claim. *Elste v. ISG Sparrows Point, LLC,* 188 Md. App. 634, 645–46, 982 A.2d 938 (2009). The evidence legally supports a claim if any reasonable fact finder could find the existence of the cause of action by a preponderance of the evidence. *Hoffman v. Stamper,* 385 Md. 1, 16, 867 A.2d 276 (2005).

---

[37] Appellees argue that the § 1983 claims should not have even reached the jury because the court should have granted summary judgment in their favor on the basis of qualified immunity. They assert that the court "rectified [its] earlier mistake" when it granted the JNOV, and this Court should affirm the dismissal of these federal claims.

[38] Mr. Cunningham argues in his reply brief that the Fourth and Fourteenth Amendment claims regarding Kodi are not properly before this Court because they were not addressed in the circuit court's opinion.

> In a jury trial, the amount of legally sufficient evidence needed to create a jury question is slight. *Id.* Thus, if the nonmoving party offers competent evidence that rises above speculation, hypothesis, and conjecture, the JNOV should be denied. *Aronson & Co. v. Fetridge,* 181 Md. App. 650, 664, 957 A.2d 125 (2008) (Internal quotation marks omitted). In determining the sufficiency of the evidence, the court must resolve all conflicts in favor of the nonmoving party. *Baltimore & O. R. Co. v. Plews,* 262 Md. 442, 449, 278 A.2d 287 (1971). Also, the court will assume the truth of all the nonmoving party's evidence and inferences that may naturally and legitimately be deduced from the evidence. *Id.*

*Barnes v. Greater Baltimore Med. Ctr., Inc.*, 210 Md. App. 457, 480 (2013). An appeal from a decision to grant qualified immunity is reviewed *de novo*. *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020).

### 3.

### Analysis

### a.

### Excessive Force

In determining whether a police officer has used excessive force in violation of 42 U.S.C. § 1983 or Articles 24 and 26 of the Maryland Declaration of Rights, we look to "whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them."[39] *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Estate of Blair by Blair v. Austin*, No. 35, Sept. Term, 2019, 2020 WL 2847516, at *8 (Md. June

---

[39] Our analysis of the excessive force claim is confined to Ms. Gaines because, as noted *supra*, Fourth Amendment rights are personal and cannot be vicariously asserted by the family. *Alderman v. United States*, 394 U.S. 165, 172, *reh'g denied*, 394 U.S. 939 (1969). With respect to Kodi, appellees correctly note that he was an innocent bystander who was not "seized" within the meaning of the Fourth Amendment. *Schultz v. Braga*, 455 F.3d 470, 480–81 (4th Cir. 2006).

2, 2020) (plurality opinion). *See Randall v. Peaco*, 175 Md. App. 320, 330 (Claims of excessive force brought under Article 24 are analyzed in the "same manner as if the claim were brought under Article 26[,]" i.e., "under Fourth Amendment jurisprudence, rather than notions of substantive due process."), *cert. denied*, 401 Md. 174 (2007). *See also* Dan Friedman, *The Maryland State Constitution: A Reference Guide* 62–63 (Oxford ed. 2011).

In an excessive force case, the plaintiff must prove, "by a preponderance of the evidence that the officer exceeded the level of force an objectively reasonable officer would use under the same or similar situation." *Blair*, 2020 WL 2847516, at *7 (plurality opinion). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). The test of reasonableness requires careful attention to "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[40] *Id.* at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often

---

[40] We note that the crime motivating the initial entry was minor, i.e., failure to appear for a misdemeanor trial, but the crime which caused the deadly stand-off, pointing a shotgun in the direction of the police, an assault, was not minor.

58

forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

The use of deadly force by a police officer is reasonable when the officer has "probable cause to believe that the suspect poses a threat of serious physical harm to the officer or to others." *Garner*, 471 U.S. at 11. *See Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) ("[T]he question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force."), *cert. denied*, 521 U.S. 1120 (1997). "Where [a] suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner*, 471 U.S. at 11.

Here, we have no trouble concluding that if, as Corporal Ruby testified, Ms. Gaines suddenly raised her shotgun into firing position and aimed it in the direction of the officers near the door, a reasonable officer could have concluded, under the facts of this case, that there was a significant threat of death or serious physical injury to the officers.[41] This testimony, if undisputed, could have supported the grant of JNOV. *See Roy v. Inhabitants of City of Lewistown*, 42 F.3d 691, 694 (1st Cir. 1994) (Although "[j]udgments about reasonableness are usually made by juries in arguable cases, even if there is no dispute

---

[41] In addition to the testimony that Ms. Gaines abruptly raised her gun into firing position in the direction of the officers, the testimony was undisputed that Ms. Gaines had resisted arrest for six hours, threatened police multiple times throughout the day, failed to obey police directives to put down her weapon, had a known history of mental illness and was off her medication, and was behaving irrationally and aggressively at times.

about what happened, . . . the facts might point so clearly toward reasonableness that no reasonable jury could decide for the plaintiff."). *Accord Blair*, 2020 WL 2847516, at \*19 (Getty, J., dissenting).

In this case, however, viewing the evidence in the light most favorable to the appellants, there was a dispute of fact regarding the veracity of that version of events. Indeed, the court noted that appellants alleged that "Ms. Gaines did not raise the shotgun into firing position," did not "aim her shotgun" at the officers, and even if she did, the officers were not in danger "because they were protected by brick walls and . . . protective equipment."

In closing argument, counsel for appellants challenged the truthfulness of Corporal Ruby's account. In support, appellant relied on evidence that they asserted showed that Ms. Gaines was not raising her gun in a firing position in the direction of the officers near the door. For example, they noted that Corporal Ruby testified that he saw only the ends of Ms. Gaines' hair braids and the barrel of the muzzle of the gun protruding from the kitchen, but several witnesses, including Corporal Ruby's expert, Mr. Key, and a fellow officer, Officer Callahan, testified that, if Ms. Gaines had been pointing her weapon at the door, her hands, arms, and "potentially a slight shoulder," would have to be exposed outside the kitchen wall. Additionally, the evidence showed that the first fatal shot entered Ms. Gaines' back on the left side, which Dr. Powers said was consistent with Ms. Gaines being behind the wall and not pointing the weapon toward the hinge side of the door.

Dr. Powers also testified that it was not his belief that Ms. Gaines raised her weapon or pointed it toward the hinge side of the door. He stated, therefore, that there was no

60

immediate threat of death or serious bodily injury at the time Corporal Ruby took the first shot.[42]

In granting the motion for JNOV, however, the court stated that there was no testimony contradicting Corporal Ruby's testimony that Ms. Gaines raised the shotgun to a firing position, and it found as a fact that Ms. Gaines, who had been resisting arrest for hours, "abruptly move[d] to a place of cover and concealment and raise[d] her shotgun in the direction of the police officers."[43]

When the issue of reasonableness of a police officer's action or the applicability of qualified immunity "turns upon which version of facts one accepts, the jury, not the judge, must determine liability." *King v. State of California*, 242 Cal. App. 4th 265, 289 (2015). *Accord Blair*, 2020 WL 2847516, at *5 (plurality opinion) (The jury decides the weight of evidence, and when it presents more than one inference, the issue is for the jury to decide.); *Nathan v. Dep't of Human Servs.*, 407 P.3d 857, 866 (Or. Ct. App. 2017) ("Whether qualified immunity is established is a matter of law for the court to decide, but, if the availability of the defense depends on facts that are in dispute, the jury must determine those facts.").

Here, where there was a dispute of fact regarding what happened on August 1, 2016, it was for the jury here to determine, based on the evidence, what occurred, and whether,

---

[42] Although there were attempts at trial to impeach this testimony with Dr. Powers' prior deposition testimony, there was no argument below, or on appeal, challenging the admissibility of Dr. Powers' specific testimony in this regard.

[43] The court also stated that, even if Corporal Ruby was wrong, qualified immunity applied where an officer makes a mistake of fact.

in light of its finding, Corporal Ruby acted reasonably in firing that first shot. The jury decided that Corporal Ruby's first shot, on the facts presented, was not reasonable. The circuit court erred in usurping the jury's finding and granting JNOV. Accordingly, we reverse the court's grant of JNOV in this regard.

### b.

### Dismissal of Claims Against Baltimore County

As indicated, the circuit court dismissed all claims against the County. In so doing, the court noted that, under *Espina v. Jackson*, 442 Md. 311 (2015), there is a distinction between being sued as a defendant and a local government's duty to indemnify its employees under the LGTCA. Here, the County was not seeking to avoid indemnification, but it was asking only to be dismissed as a named defendant. The court stated that, because appellants had failed to prove the *Monell* claim (Count IX), i.e., that the County had an official municipal policy that caused injury, Baltimore County should be dismissed as a defendant.

Appellants, despite filing briefs totaling more than 170 pages challenging the court's rulings, address this ruling with only one sentence, asserting: "Additionally, Baltimore County is a proper Defendant," citing *Prince George's County v. Longtin*, 419 Md. 450, 493 (2011). Given this sparse treatment of the issue, we could decline to consider it. We will, however, address the ruling.

The County similarly spends little time on this issue, stating merely that the circuit court properly dismissed "the § 1983 *Monell* claims against the County."[44] At oral argument, counsel for appellants stated that they were not challenging the circuit court's ruling on the *Monell* claims. Accordingly, we affirm the grant of JNOV on the § 1983 claims against the County.

As appellants point out, though, however briefly, the Court of Appeals has held that "local governmental entities do, indeed, have respondeat superior liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of the employment." *Longtin,* 419 Md. at 493 (quoting *DiPino v. Davis*, 354 Md. 18, 51–52 (1999)). Because the circuit court did not specifically address this, we vacate the JNOV of the state claims against the County and remand for the circuit court to consider and make any necessary factual findings.

**E.**

**Motion for New Trial**

As indicated, the circuit court made an alternate ruling, stating that, should the JNOV ruling be reversed on appeal, it granted appellees' motion for a new trial on the ground that the verdict sheet was "irreconcilably inconsistent" because it failed to apportion damages between the state claims, which are subject to the LGTCA damage cap, and federal claims, which are not subjected to the cap. The court, after discussing cases

---

[44] In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), the Supreme Court held that municipalities were liable under § 1983 for constitutional violations of its employees only when the violation was "caused" by the municipality.

holding that inconsistent verdicts are not permitted in civil cases, stated that the verdict was not logically inconsistent, but it was defective because the jury did not specify the apportionment, if any, of the total award between the state and federal claims, and therefore, the court "would be left to speculate what, if any figure, is subject to" the damages cap.

## 1.

### Parties' Contentions

Appellants contend that the circuit court erred in conditionally granting appellees' motion for a new trial. They argue that appellees waived their right to complain that the verdict sheet was irreconcilably inconsistent, and "invited" the error, because: (1) they objected to appellants' proposed verdict sheet containing separate damage lines for each cause of action and advocated for a single line for each claim with no separation of damage; and (2) after the jury returned its verdict, they did not object before the jury was discharged.

On the merits, appellants argue that the circuit court erred in finding that the verdict was inconsistent because the verdict was consistent on all counts, in favor of appellants, consistent with the weight of the evidence. They assert that, although the verdict is "indeterminant" regarding how damages should be apportioned, appellants anticipated this result and requested a verdict sheet to address it, but the circuit court and appellees rejected the proposed verdict sheet. They argue that, in light of this background, it is "astounding" that the court granted a new trial on liability and damages. In their view, apportionment of the award is "separate and apart from the clear finding of liability or damages," and a new

64

trial "would unjustly eliminate the jury's clear finding of liability when there is no legal basis for doing so."

Appellees argue that the circuit court properly granted a conditional new trial because the verdict sheet was "inherently flawed and legally deficient." They assert that it was an irreconcilably inconsistent verdict because it did not contain separate lines for damages for the state and federal claims, and therefore, the court was "unable to determine, absent guesswork and pure speculation," what portion of the $32,873,543 damages awarded to Kodi was subject to the LGTCA cap and the portion for the federal claims that were not subject to the cap. They also argue that the damages awarded to Karsyn Courtney ($4,525,216.32), Ryan Gaines ($300,000), and Rhanda Dormeus ($300,000) were irreconcilably inconsistent because their wrongful death claim was not submitted to the jury, and therefore, that there was no legal basis to award damages to these individuals. Finally, appellees contend that the issue of an inconsistent verdict was not waived because they raised it by post-trial motion.

## 2.

## Appealability

In *Buck v. Cam's Broadloom Rugs, Inc*., 328 Md. 51, 57 (1992), the Court of Appeals explained that "an order granting a new trial is not immediately appealable because it is an interlocutory order" that is not "ultimately reviewable" until "appeal is taken from the final judgment." In other words, the proper procedure is for the case to return to the trial court for retrial, and if a final judgment ultimately is issued, the aggrieved party can then challenge the initial grant of the new trial on appeal. *Id.*

The ruling in *Buck*, at first blush, appears to preclude an appeal of the court's grant of the motion for new trial in this case. The procedural posture of *Buck*, however, is distinguishable from this case.

In *Buck*, 328 Md. at 53, the jury awarded the plaintiff minimal damages based on negligence resulting in an automobile accident, but it declined to award him damages for loss of consortium. The plaintiff filed a motion for new trial based on damages, arguing the verdict was "grossly inadequate" and likely the result of improper comments made by the defense attorney at trial. *Id.* The circuit court granted the motion for new trial and the defendant appealed. *Id.* at 54. The Court of Appeals held that the appeal was properly dismissed "because it was not taken from a final judgment." *Id.* Upon retrial, the plaintiff was awarded a more substantial damage award, and the defendant appealed on the basis that the trial court had abused its discretion by granting the new trial. *Id.* The Court of Appeals ultimately held that the circuit court did not abuse its discretion in granting the new trial because a jury verdict that is against the weight of the evidence is within the purview of the trial court to overturn. *Id.* at 60. Thus, in *Buck*, there was no appealable final judgment at the time the new trial was granted.

Here, by contrast, the circuit court issued a final judgment when it granted appellees' motion for JNOV and dismissed all claims. *See Kusens v. Pascal Co., Inc.*, 448 F.3d 349, 358 (6th Cir. 2006) (When a trial court "grants a motion for JNOV, that order is the final judgment of the court."). The court then made a conditional ruling on the motion for new trial in accordance with Md. Rule 2-533(c), which provides:

When a motion for new trial is joined with a motion for judgment notwithstanding the verdict and the motion for judgment notwithstanding the verdict is granted, the court at the same time shall decide whether to grant that party's motion for new trial if the judgment is thereafter reversed on appeal.

In *Franklin v. Gupta*, 81 Md. App. 345, 350, 362, *cert. denied*, 319 Md. 303 (1990), this Court stated, without addressing the general rule of non-appealability of new trial orders, that when a new trial is conditioned upon the reversal of a JNOV, "the grant of a new trial is appealable." It noted that, "because of the broad range of discretion accorded the trial judge, the decision is reviewable, on an abuse of discretion standard, only under extraordinary circumstances."

Other courts have specifically addressed the distinction from the general rule of non-appealabilty and held that, "if an appeal is properly taken from a judgment notwithstanding the verdict, the appellate court, on holding that the J.N.O.V. was erroneous, has the power to review a conditional order of the trial court granting a new trial." *Anderson v. City of Atlanta*, 778 F.2d 678, 689 n.15 (11th Cir. 1985). *Accord Murphy v. City of Long Beach*, 914 F.2d 183, 185 n.2 (9th Cir. 1990) (Although the grant of a new trial is normally an unappealable interlocutory order, because the new trial was conditioned upon the reversal of the JNOV, "the court's judgment [was] final and reviewable."); *Jackson v. Condor Mgmt. Group, Inc.*, 587 A.2d 222, 226 n.4 (D.C. 1991) ("This court has recognized an exception to the general rule of non-appealability of new trial orders before final judgment when the trial court has entered a conditional new trial order, in tandem with a judgment n.o.v."); *Mairose v. Federal Exp. Corp.*, 86 S.W.3d 502, 513 (Tenn. Ct. App. 2001) (Appellate court, upon reversing a trial court's grant of a motion

67

for JNOV, may remand for a new trial or reinstate the verdict when there are "exceptional circumstances and when the interest of justice so requires."). These courts have based these holdings on rules that provide that, if a JNOV with a conditionally granted new trial is reversed on appeal, "the new trial must proceed unless the appellate court orders otherwise." Fed. R. Civ. P. 50(c). *Accord* Tenn. R. Civ. P. 50.03 ("If the motion for a new trial is thus conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered.").

Maryland Rule 2-532(f)(1) similarly provides:

> If a motion for judgment notwithstanding the verdict is granted and the appellate court reverses, it may (A) enter judgment on the original verdict, (B) remand the case for a new trial in accordance with a conditional order of the trial court, or (C) itself order a new trial. If the trial court has conditionally denied a motion for new trial, the appellee may assert error in that denial and, if the judgment notwithstanding the verdict is reversed, subsequent proceedings shall be in accordance with the order of the appellate court.

Based on this authority, we hold that, although the grant of a new trial is typically an unappealable interlocutory order, when the order for a new trial is conditioned on the reversal of the grant of JNOV, the judgment is appealable. We thus turn to the merits of the grant of the motion for new trial.

**3.**

**Analysis**

The decision whether to grant a motion for a new trial is a matter within the discretion of the trial court. *Exxon Mobile Corp. v. Albright*, 433 Md. 303, 349, *cert. denied*, 571 U.S. 1045 (2013). The court's decision in this regard will be reversed only

upon a showing that the court abused its discretion. *Franklin*, 81 Md. App. at 362. An abuse of discretion will be found when a court bases a decision on an incorrect legal standard. *Rodriguez v. Cooper*, 458 Md. 425, 437 n.9 (2018).

Initially, we are troubled by the grant of a new trial based on the verdict sheet given the proceedings that occurred prior to the jury rendering its verdict. To be sure, a trial court has discretion whether to address an unpreserved issue in considering a motion for new trial. *See Isley v.* State, 129 Md. App. 611, 619 (2000) (Non-preservation is an "unassailable reason" for the trial judge to deny a motion for new trial, if the court, in its discretion, chooses to do so.). There was more, though, in this case than a mere failure to preserve the issue.

Counsel for Mr. Cunningham clearly advised the court that it was his position that the jury could render separate damages amounts for each cause of action, i.e., the § 1983 claim, violation of the Maryland Declaration of Rights, and battery. The court disagreed, and counsel then highlighted the problem at issue with the verdict sheet the court prepared. Counsel questioned what the court would do if the jury came back with damages in an amount more than $400,000 and they argued it was all for the § 1983 claim and appellees argued it was all under the State claims, subject to the cap. The court responded: "I will deal with that when it comes."[45] The County then concurred with the court that the verdict

---

[45] Counsel for the other appellants argued that if they jury found a violation of both the State claims and the § 1983 claims, "anything above the cap is to be attributed to 1983."

sheet merely needed to set out a line for liability and then go to damages. And when the jury came back with its verdict, the County did not object to the verdict as inconsistent.

Under these circumstances, it is troubling that, after a three-week trial, when the exact scenario that counsel was trying to prevent occurred, the court ordered a new trial based on a defective verdict. We also note that the alleged inconsistency dealt with the damages awarded, not liability, yet the court simply ordered a new trial

Despite our concern with the court's order under these circumstances, we need not address whether this alone would have amounted to an abuse of discretion. *See King*, 242 Cal. App. 4th at 296 (If no party requests clarification of an inconsistency in the verdict, trial court must interpret the verdict in light of the instructions and evidence and attempt to resolve any inconsistency.). Rather, we reverse the court's ruling granting the motion for new trial on the basis of an irreconcilably inconsistent verdict on the merits. The verdict was not irreconcilably inconsistent.

In *S. Mgmt. Corp. v. Taha*, 378 Md. 461, 488 (2003), the Court of Appeals explained what constitutes an irreconcilably inconsistent verdict: "Where the answer to one of the questions in a special verdict form would require a verdict in favor of the plaintiff and an answer to another would require a verdict in favor of the defendant[.]" (quoting *S&R Inc. v. Nails*, 85 Md. App. 570, 590 (1991)).[46] In that case, a terminated employee brought a malicious prosecution action against two co-workers and his former employer,

---

[46] This also applies to general verdicts that produce inconsistent results between various parties. *See S. Mgmt. Corp. v. Taha*, 378 Md. 461, 490 (2003).

70

based on respondeat superior. *Id.* at 469–70. The verdict sheet contained three general questions regarding liability, one for each defendant. *Id.* at 473. The jury returned a verdict in favor of the two co-workers but against the employer. *Id.* The Court of Appeals agreed that this result was "irrevocably inconsistent," noting that the employer could not be liable under respondeat superior if its employees were not liable. *Id.* at 467, 479.

Here, the verdict sheet was not irreconcilably inconsistent. As appellants note, the jury verdict was completely consistent, finding that Corporal Ruby's action was unreasonable and awarding damages. The circuit court abused its discretion in granting a conditional new trial on this basis.

## F.

## Remittitur

We next address appellees' post-trial motion to remit the damages as exceeding "any rational appraisal or estimate of the damages that could be based on the evidence before the Jury." In that regard, the court stated:

> This Court finds that the non-economic damages awarded to the various Plaintiffs are excessive and shock[] the conscience, and but for this Court dismissing the matter for grant of qualified immunity, or in the alternative granting a new trial because of the defective verdict, the Court would remit the [jury's] awards.

Appellees contend the court did not abuse its discretion by granting a new trial because it properly found that the non-economic damages were excessive and shock the conscience. They assert that appellants failed to substantively address this argument.

Appellants argue in their reply brief that the question of remittitur is not before this Court. They assert that the court's statement in this regard was *dicta* because the court

71

never gave them an opportunity to accept a reduced figure. Moreover, appellants argue that there was no basis for such a request below because appellees did not present any evidence pertaining to damages to refute the expert testimony concerning Kodi's physical and psychological injuries.

A trial court, upon finding that a verdict is excessive may order a new trial unless the plaintiff agrees to accept a lesser amount fixed by the Court. *Conklin v. Schillinger*, 255 Md. 50, 64 (1969). In determining whether a new trial should be granted on the ground of excessiveness of the verdict, the standard is "grossly excessive" or "shocks the conscience of the court." *Id.* at 69. A trial court is not required, however, to provide for remittitur when there is an excessive verdict, but it may, in its discretion, grant a new trial. *Id.* at 66.

> With respect to remittitur, this Court has explained:
>
> Historically, a remittitur was the voluntary submission by a plaintiff to pressure brought on him by a trial judge. When, in response to a defendant's motion for a new trial and/or remittitur, the trial judge agreed that a jury's award of damages had been excessive, the trial judge could threaten to order a new trial unless the plaintiff agreed to "remit" that portion of the award that the judge deemed to be excessive. The reduction itself, however, could not occur unless the plaintiff agreed to it. The modality of reduction was the plaintiff's "voluntary" remission.

*Darcars Motors of Silver Spring, Inc. v. Borzym*, 150 Md. App. 18, 60–64 (2003), *aff'd*, 379 Md. 249 (2004).

The Court then explained that the doctrine has shifted over the years because Maryland courts had called into question whether voluntary submission by the plaintiff, as an alternative to a new trial, was required. *Id.* at 62. In *Bowden v. Caldor*, 350 Md. 4, 46

(1998), the Court of Appeals acknowledged that, "under normal Maryland *practice,* a court's reduction of a compensatory damages award as excessive is ordinarily accompanied by a new trial option," it had never explicitly held that the new trial option was required for either compensatory or punitive damages. The Court assumed that a trial court could not reduce a compensatory damages award on the ground of excessiveness without offering a new trial option. *Id.* at 46. *See*, *e.g.*, *Owens-Illinois, Inc. v. Hunter*, 162 Md. App. 385, 390–91 (Plaintiff agreed to remit $1 million of a $2 million jury award to avoid a new trial.), *cert. denied*, 388 Md. 674 (2005); *Hebron Volunteer Fire Dep't, Inc. v. Whitelock*, 166 Md. App. 619, 627 (2006) (The Court granted the department's motion for a new trial on damages unless the plaintiff agreed to a remittitur of $225,000.). It drew a distinction between punitive damages, however, which, unlike compensatory damages, do not involve a question of fact, but rather, principles of law, and it held that when a court reduces a punitive damages award for excessiveness, the court is not required to give the plaintiff the option of a new trial. *Bowden*, 350 Md. at 46–47. A reduction in a punitive damages award by a trial judge does not interfere with a plaintiff's right to a trial by jury. *Darcars*, 150 Md. App. at 68.

With this background, we turn to the trial court's ruling in this case. The court stated that, but for its other rulings, it "would remit the jury's awards." It did not actually do so, however, so there is no ruling in this regard for the Court to review. On remand, the circuit court can address the applicability of the damages cap, and if it determines that the verdict remains as it is, an amount that the court found to be excessive, it can address the issue whether a remittitur or new trial is warranted.

73

## G.

## Other Issues Regarding Damages

## 1.

## Funeral Expenses

The circuit court granted appellees' motion to set aside the judgment granting Ms. Dormeus economic damages in the amount of $7,000 for funeral expenses. The court stated: "The only evidence that Dormeus paid the funeral expenses was her testimony. If indeed she paid those expenses, she may request to recover those expenses from the personal representative of the estate."

Appellants contend that the circuit court erred by vacating the jury's award in this regard. Appellees do not respond to this argument.

The circuit court vacated this award on the basis that Ms. Dormeus "may request to recover those expenses from the personal representative of the estate" pursuant to Md. Code Ann. (2017), § 8-106 of the Estates & Trusts Article ("ET"). The circuit court, however, failed to consider ET § 7-401(y)(1)(ii), which provides that "[i]n an action instituted by the personal representative against a tort-feasor for a wrong which resulted in the death of the decedent, the personal representative may recover the funeral expenses of the decedent up to the amount allowed under § 8-106(c) of this article," i.e., $15,000. Accordingly, we reverse the circuit court's grant of appellees' motion to set aside the funeral expenses award.

74

**2.**

**Economic & Non-Economic Damages**

Appellees argued in their post-trial motion that there was no support for the non-economic damages awarded to Ms. Dormeus, Ryan Gaines, and Karsyn Courtney because the wrongful death claim (count I) was never submitted to the jury, and therefore, there was no legal basis to award damages to those parties. The court stated that it was not necessary to address that issue because it had granted JNOV in appellees' favor.

Appellees also requested that the court vacate the economic damages awarded to Ms. Gaines' estate, asserting that there was not sufficient evidence of economic loss attributed to Korryn Gaines. The court granted that request based on its findings that Corporal Ruby's actions were not lawful, and he was entitled to qualified immunity.

Given our reversal of the JNOV on appeal, *supra*, the circuit court should address the arguments related to these damage awards on remand.[47]

**CONCLUSION**

Given the numerous rulings addressed, we will briefly summarize our resolution of the issues presented. Initially, we hold that the circuit court properly granted the motion for summary judgment with respect to the claims regarding the initial entry by Officer Dowell and Officer Griffin. Therefore, we affirm the court's ruling in this regard.

---

[47] The circuit court also dismissed the bystander liability (count V) because, after dismissing the County as a defendant, Corporal Ruby was the sole defendant, and therefore, there was "no other bystander potentially liable." Appellants do not challenge this finding on appeal.

With respect to the post-trial motions, we hold that the court erred in granting the motion for JNOV, with the exception of its ruling dismissing the § 1983 claims against the County. Therefore, we: (1) reverse the grant of JNOV with respect to the claims against Corporal Ruby; (2) affirm the grant of JNOV with respect to the § 1983 claims against the County; and (3) we vacate the ruling granting JNOV to the County on the other claims and remand for further proceedings. We also reverse the court's ruling granting appellees' motion to set aside the funeral expenses award.

With respect to the court's conditional ruling granting the motion for new trial based on an irreconcilably inconsistent verdict, we conclude that the court abused its discretion in that regard. Therefore, we reverse that ruling.

We remand to the circuit court for consideration of remaining issues relating to damages. Those issues include, but are not limited to, the damages cap and remittitur.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED, IN PART, AND REVERSED/VACATED, IN PART. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE SPLIT EVENLY BETWEEN APPELLANTS AND APPELLEES.**